IN THE

# HIGH COURT OF ERRORS AND APPEALS

FOR THE

## STATE OF MISSISSIPPI.

---

## OCTOBER TERM, 1856.

### ROGER A. HEIRN *v.* JOHN J. M'CAUGHAN et ux.

1. ACTION: NATURE OF: AGAINST COMMON CARRIER FOR BREACH OF GENERAL DUTY.—
An action against a common carrier for a failure to stop at a particular place
and take on board the plaintiff as a passenger, according to previous notice ad-
vertised to the public, is founded in *tort*, and not on a special contract—it being
for a violation of a general duty to the public, and not for a breach of a special
contract with the plaintiffs.

2. SAME: NATURE OF: HOW DETERMINED.—The character of an action must be de-
termined from the nature of the grievance complained of, rather than by the
form of the declaration; and hence, where the ground of complaint against a
common carrier is his failure to comply with an engagement made to the public
by previous advertisement, to stop at a particular place and transport passen-
gers thence to another point, it will be considered as an action founded in *tort*,
although the declaration allege a promise to the plaintiff arising from the ad-
vertisement; and moreover, in cases of that kind the courts are inclined to con-
sider the action as founded in *tort*, unless a special contract be very clearly
alleged.   See 6 M. & S. 385; 8 A. & E. 936.

3. COMMON CARRIER: HIS DUTY TO COMPLY WITH THE TERMS OF HIS PUBLISHED ADVER-
VOL. III.—2

Heirn *v.* M'Caughan et ux.

TISEMENT.—A common carrier, by the publication of previous notice to the public that he will stop his vessel at an appointed time and place, for the purpose of receiving on board passengers for transportation, contracts an engagement with the public which his duty as a common carrier binds him to perform, and for a violation of which he will be liable in damages to any person injured thereby, who trusted and acted on the faith of such notice, without any consideration moving to him from such person.

4. HUSBAND AND WIFE: WHEN PROPER TO JOIN AS PLAINTIFFS IN ACTION FOR DAMAGES.—It is proper to join the husband and wife as plaintiffs in an action against a common carrier, for a violation of his general duty to the public, in failing to comply with his engagement to stop his vessel at a particular place, whereby the wife was unable to take passage on it.

5. INSTRUCTIONS: WHEN NOT ERRONEOUS IN ASSUMING EXISTENCE OF A FACT.—It will not be error for the court, in charging the jury, to assume the existence of a fact clearly proven by the evidence, and concerning which there was no conflict in the evidence, nor contest on the trial.

6. SAME: LITERAL OBJECTIONS TO MUST BE TAKEN BEFORE VERDICT.—After verdict, and when the finding is sustained by the evidence, it is too late to object to an instruction, that it did not expressly confine the jury, in determining the question, to the evidence before them, but left them to act on their belief from any cause; in such a case the presumption is, that the verdict was found on the evidence, because the evidence warranted the finding.

7. PARTNERSHIP: POWER OF CO-PARTNER TO BIND THE FIRM.—A partner cannot bind the firm by an act clearly not within the partnership business; yet he has power to bind the firm in all parts of the business in which it is engaged, and in all transactions, whether direct or incidental, appertaining to its business. And though the partner exceed the terms of the partnership, yet so far as third persons, having transactions with them, without notice, are concerned, the co-partners are bound, if the transaction be such as the public may reasonably conclude to be embraced within the partnership business, or be incident or appropriate to such business, according to the course and usage of carrying it on.

8. SAME: LIABILITY OF FIRM FOR A TORT OF ONE OF ITS MEMBERS.—The *tort* of one partner is considered the joint and several *tort* of all the partners, wherever the wrongful act complained of is connected with the business of the firm or is incidental to it, as the business is carried on; and a partner who has no direct participation in the *tort* of his associate, is chargable *civiliter* to the same extent (including exemplary damages,) as the real actor is bound.

9. INSTRUCTIONS: SHOULD NOT BE GIVEN WHEN IRRELEVANT TO EVIDENCE.—Instructions should not be given which are based upon a hypothetical state of facts, which there is no evidence to sustain, as they would but suggest to the jury facts not proven before them.

10. CONTRACT: INCONSISTENT OBLIGATIONS: EFFECT OF.—If a person assume obligations to different parties, the performance of which may become incompatible with each other, both parties being entitled in equal right, it is no excuse for a default to one party, that both obligations could not be performed, and that the person bound chose to perform his obligation to the other; and hence, if a com-

mon carrier, engaged in carrying the United States mail, and also in transport-
ing passengers, fail to discharge his obligations to the latter, it will be no excuse
that such failure was rendered necessary, in order to transport the mail in pro-
per time.

11. DAMAGES: EXEMPLARY, WHEN ALLOWABLE AGAINST COMMON CARRIER.—Exem-
plary damages are recoverable in an action founded on *tort* against a common
carrier for his violation of his duty, in wilfully and capriciously refusing to land
his vessel and receive the plaintiff on board as a passenger, according to his
advertisement.

12. DAMAGES: PLEADING: WHEN NECESSARY TO ALLEGE SPECIAL DAMAGE IN DECLA-
RATION.—In an action for damages, when the injury sustained did not necessa-
rily result from the act complained of, it is necessary to allege in the declara-
tion the special damage, in order to prevent surprise on the defendant; but
when the action is for general damages, arising directly from the grievance com-
plained of, and as a necessary effect of the wrong, the law presumes damage to
have occurred from the wrongful act; and in such a case it is not necessary to
state the particular circumstances of aggravation in the declaration; and hence,
in an action against a common carrier, for damages resulting from his failure to
stop and take the plaintiff on his vessel as a passenger, according to previous
notice published by him, whereby the plaintiff was exposed to great suffering
and exposure from the inclemency of the weather; the peculiar condition of the
plaintiff's health at the time of the exposure, may be given in evidence in aggra-
vation of damages.

13. EVIDENCE: PAROL, WHEN ADMISSIBLE TO EXPLAIN WRITING: COMMON CARRIERS.—
A common carrier engaged in carrying the United States mail, and also in the
transportation of passengers, wrote a letter to a postmaster at one of the offices
from which he was accustomed to carry the mail, informing him that on a cer-
tain day one of his vessels, which did not ordinarily stop and receive a mail or
passengers at that place, would stop there, and also requesting the postmaster
to have a mail in readiness, and to "advise all who may feel interested in the
above." *Held,* that the expression "all who may feel interested," &c., did not
refer alone to persons interested in the arrival and departure of the mail, but
under the circumstances, included also those who wished to take passage on the
vessel; and further, that it was competent to introduce parol evidence of the
circumstances under which the letter was written, and of the nature of the busi-
ness in which the common carrier was engaged, in explanation of the phrase,
"all who may feel interested," &c., in order to show that "passengers" were
embraced in it.

IN error from the Circuit Court of Harrison county. Hon.
John E. M'Nair, judge.

The defendants in error instituted their actions in the court be-
low against the plaintiff in error, as stated in the opinion of the
court. The two causes, by consent of parties, were consolidated

and tried together, and a verdict rendered in both cases in favor of plaintiffs for $2050; upon which judgment was entered in their favor against the plaintiff in error.

On the trial of the cause, M'Caughan and wife proved that the defendant Heirn, together with Grant, Geddes and Day, were the proprietors of several steamboats, which they engaged, both before and after the 24th December, 1853, in carrying the United States mail and passengers and freight between the ports of New Orleans and Mobile and the intermediate landings on the sea-coast of this State. That among these was the steamer Florida, which was commanded by Captain Grant, one of the co-partners; that R. Geddes, another of the co-partners, kept the office of the company in New Orleans; from that office were issued notices to the public in relation to the running of the steamers belonging to the company, the dates of their arrival and departure at and from the ports at which they touched, and as to all other matters concerning the management and regulation of the line, in which the public were interested; and one Abrams was the confidential clerk of the company, and employed in said office. It also appeared, that the winter arrangement, extending from 1st November to 1st June, was different from the summer arrangement; that during the former period the boats engaged in carrying the mails and passengers, &c., between New Orleans and Mobile, did not stop at Pascagoula ordinarily, the business at that point being done by one of the company's boats, called the Creole; and that they were not so advertised to stop in the general notice published in the newspapers in New Orleans and Mobile, but that it was the practice of the company, when deemed advisable, to give special notice at Pascagoula and other landings, of the intended stopping of a boat at such points. That accordingly, on the 20th day of December, 1853, the following letter was written by Abrams, the confidential clerk, and issued from the office in New Orleans, and transmitted by one of the company's boats, and delivered to the Postmaster at Pascagoula on the 21st of that month:—

"Office of the Mail Line Agency, New Orleans, Dec. 20, '53.

"Postmaster, Pascagoula: DEAR SIR—This is to advise you that the mail-boat hence for Mobile on Saturday next will stop at

Pascagoula, instead of the steamer Creole.  You will please have a mail in readiness for Mobile to go by said boat, and oblige, &c.

R. GEDDES,

By ABRAMS.

"N. B.—Advise all who may feel interested in the above."

That the postmaster, upon its reception, posted it up on the door of a store-house in Pascagoula, near the post-office, and that by this means it was generally known at that place that one of the defendants' steamboats would touch at that point on the 24th of December, 1853, for the purpose of receiving and taking on board passengers for Mobile.

It also appeared that M'Caughan, who resided at Mississippi City, arrived in the neighborhood of Pascagoula on the 21st of December, in his schooner, and accompanied by his wife, and bound for Mobile, and that they remained there until the 24th. That upon being informed of the notice which had been sent to the postmaster at Pascagoula, he sent his schooner home and procured transportation for himself and wife to Pascagoula, with the view of taking the defendant's boat on that evening for Mobile. That the plaintiffs arrived at Pascagoula on the afternoon of the 24th, and supped at the hotel, and about nine o'clock at night went to the pier-head at the outer end of the wharf to await the arrival of defendant's boat, which, according to the usual course of the line, was expected to arrive between that hour and two o'clock, A. M.  That the wharf extended three-fourths of a mile out into the gulf; and that the pier-head was one mile from the only hotel in the place.  That it was necessary for passengers, particularly ladies, to remain at the pier-head, in order to be certain to get on the boat, the time for remaining being usually short. It further appeared that there was a house at the pier-head, in which persons awaiting the arrival of the company's boats, usually remained, but it was uncomfortable, and was without any accommodations for sleeping, or fire; that the night was unusually cold and disagreeable, and that plaintiffs remained at the pier-head from nine o'clock until sunrise of the next morning, when they were obliged, in order to get to Mobile, to take one of defendant's boats, the Creole, and go to New Orleans, and then procure pas-

sage for Mobile.   It was also shown that Mrs. M'Caughan was in delicate health—being considerably advanced in pregnancy, and that the situation of the persons remaining on the pier-head that night, was exceedingly uncomfortable and perilous, and that M'Caughan, to protect his wife from the cold, was compelled to surrender the use of his coat, and to remain during the night in his "shirt-sleeves."

It also appeared from the plaintiffs' testimony, that about two o'clock in the morning the wharf-master at Pascagoula saw some lights on the gulf which he supposed to be the lights of the defendant's steamer Florida, and that he so informed the company present at the pier-head, and also that said boat had passed; but it was also shown that it was in the opinion of the wharf-master and the company doubtful whether said lights belonged to said boat, and that, therefore, plaintiffs and the others who were expecting the arrival of said boat, remained till morning.

Plaintiffs also proved that Grant, one of the co-partners in the mail line company, and the captain of the steamer Florida, was informed before he left New Orleans on the trip to Mobile (including the 24th December, 1853,) that Geddes had sent the letter before referred to, to the Postmaster at Pascagoula, and that he then declared that he would not stop there, and that Geddes had no authority to make such arrangement, and that if any damages were recovered for such failure to stop, that Geddes ought to pay it.

Three or four witnesses for plaintiffs, who were residents at Pascagoula, testified that the steamer Florida, on the night of the 24th of December, 1853, could have stopped at Pascagoula without danger ; that the tide was not too low, nor the wind too hard to admit of such stoppage.

On the part of defendant, it was proven by the pilot of the steamer Florida, engaged in running her on the night of the 24th December, that owing to the low tide and the storm, said steamer could not have stopped at Pascagoula without danger, and that if she had, there would have been a failure to deliver the mail at Mobile, in proper time.   Two or three witnesses, being the employees of defendant, testified, in substance, the same.   It was also proven, on behalf of defendant, that it was usual and custo-

mary for the mail line company to disregard special notices to stop at particular places, if, in the judgment and opinion of the captain and pilot, it was not advisable; that the running and management of the boats were under the charge of the captain and pilot.

M'Caughan's arrival in Mobile was delayed some three or four days, by reason of the failure of defendant's boat to stop at Pascagoula; and he also was put to extra expense, not exceeding $30. No physical injuries were shown to have actually resulted to M'Caughan, or his wife, by reason of their exposure on the night of the 24th December, 1853.

During the progress of the trial, the defendant objected to evidence proposed to be introduced by plaintiff, in reference to the pregnancy of Mrs. M'Caughan, on the night of the 24th December, 1853, "because it was foreign to the issue, and that it was not proximate to the issue, and calculated to mislead the jury, and that her situation was not such as necessarily grew out of this transaction;" but the court overruled the objection, and the evidence was permitted to go to the jury; and the defendant excepted. Other special exceptions were taken to the introduction of evidence on the part of the plaintiffs, but they were not relied on as error in this court, and are therefore not set out.

The court, at the instance of the plaintiffs, charged the jury as follows: —

1. That the written publication, offered in evidence of the promise of the mail line company, to send one of their boats to Pascagoula, at the time therein referred to, is an engagement or promise that the plaintiff had the same right to rely on, as if it had been an express engagement with the plaintiff by name; *provided* they believe that said publication was intended as a notice to passengers, or to the public, that passengers would be carried.

2. That if the jury believe, from the evidence, that the plaintiffs, John J. M'Caughan and wife, were prepared in waiting on the usual place of landing, to take passage on said boat, in pursuance of the notice in said publication, and did not get off, in consequence of the failure of the boat to go according to promise, that it was a breach of said engagement, which entitles the plaintiffs to an

action for damages, unless defendant shows that he was prevented by some inevitable accident, or some occurrence beyond his control from keeping the engagement.

3. That if the jury believe, from the evidence, that such breach of the engagement, on the part of the mail line company, is established in this case, that the rate of damages which the plaintiffs are entitled to, from the exposure and discomfort they suffered in waiting for said boat, is such as the jury, in their discretion, may think proper to assess—having the right to give exemplary damages.

4. That no engagement of said steamboat mail line company, as carriers of the mail, is any extenuation or excuse for their breach of promise to plaintiffs, made by their written engagement given in evidence in this suit.

5. That the damages which are lawfully recoverable in this suit, so far as resulting from personal discomfort and exposure is involved, is equally recoverable in behalf of J. J. M'Caughan and his wife.

6. That if the jury believe from the evidence, that the plaintiffs, John J. M'Caughan and his wife, relying upon the written publication of the defendant, did await, on the wharf, and at the usual place, for the arrival of the mail-boat promised, and said boat did not come in, and that the said publication was false, and calculated to deceive, and did deceive the plaintiffs, they may assess such damages for such false publication and deceit as, in their discretion, they may consider the plaintiffs suffered by such falsehood and deception.

At the instance of defendant, the court gave the following instructions :—

1. That M'Caughan's right to demand a passage on the steamer Florida, is not an unlimited, but a limited right, subject to such rules and regulations as the proprietors or officers of the boat may prescribe for the due accommodation of passengers, and the arrangement of their business ; and further, if they believe, from the evidence, that, owing to low tide and high winds, the boat could not have been landed at Pascagoula on the 24th of December,

1853, then an impossibility of the boat cannot be demanded; and in that event they will find for the defendant.

3. That if the jury believe, from the evidence, that it was not necessary for M'Caughan and wife to leave the hotel and go and stay on the wharf in order to get on the boat, then if they receive an injury in remaining on the wharf, such injury is too remote, and they should not take that matter into consideration in assessing damages.

8. That the plaintiff is not, in any event, entitled to recover for any damages but what may arise naturally from the wrongs or injuries complained of and proved; and they must be the natural consequence of the injury so proved, and such damages should be reasonable and proportionate to the injury sustained.

10. That the plaintiffs in this case have no right to recover any damages for any disappointment or suffering experienced by others on the wharf at Pascagoula that night when the steamboat failed to come in, or for any other dereliction of said steamboat company of which defendant is one, in which M'Caughan was not a sufferer, or for any other grievance or wrong which said company may have caused the public generally; and any such wrong or injury should not be taken into consideration to aggravate the damage in this suit.

The following instructions, asked for by defendant, were refused:—

4. That if the jury believe, from the testimony, that M'Caughan went to Pascagoula, knowing that the boat would not or could not stop there on the night of the 24th December, 1853, with a view to seek an advantage and to get a cause of action so as to enable him to sue the defendant for damages, then they will not find for the plaintiff, but for the defendant.

5. That if they believe, from the evidence, that M'Caughan was inimical to the owners of the steamer Florida, and that he was seeking passage on said boat with a view to get up opposition against them, or to interfere with the interest or business of said boat in any way, they had a right to refuse him passage on said boat.

6. That if they believe, from the evidence, that the pilot and captain of the Florida knew, when the boat left New Orleans, that

it was impossible to land the boat at Pascagoula, they had a right then to say that she would not go to Pascagoula; and if the objections or obstructions to her landing continued until they had advanced beyond the point of landing, then they will find for the defendant.

7. That if the jury shall believe, from the evidence, that plaintiffs are entitled to recover any damages, then the true rule of estimating such damages is the actual amount of pecuniary loss sustained by said plaintiffs, for money paid out and for time lost.

9. That the true rule of estimating damages for the non-performance of contracts, or duties created or imposed by law, in which there is no element of fraud, wilful negligence or malice, is the direct pecuniary loss, which includes no more than the money actually expended, and fair compensation for the time lost by plaintiffs in this case; and the jury should be governed by this rule in estimating the damages in the case.

Instead of the 9th instruction, above referred to, the court gave the following as a modification thereof:—

9. That the jury should not, in this case, assess exemplary damages against defendants, unless they believe that their representations to the travelling public were false, and calculated to deceive and did deceive plaintiffs.

The defendant moved to set aside the verdict and for a new trial, which being overruled he excepted, and sued out this writ of error.

*D. Mayes,* for plaintiff in error.

I. Was the demurrer to the petition of John J. M'Caughan, well taken?

The answer to this depends on that to another question. Do the statements in the petition of the plaintiff disclose a valid contract between him and the defendant? They do not. No contract with or promise to the plaintiff is alleged in terms, and the facts alleged do not constitute a contract. A contract is an agreement between two or more persons, founded on sufficient consideration, to do or not to do a particular thing. These being indispensable elements in every contract, if there are not sufficient facts alleged in the

plaintiff's petition, to show their existence between M'Caughan and Heirn, the demurrer should have been sustained. We can make no more out of the allegations in the petition than this, that the defendant being a common carrier of passengers, for reward, on steamboats running between New Orleans and Mobile, gave public notice that one of the boats would be at Pascagoula on a certain night, on its way to Mobile, that plaintiff attended at the place designated and at the time appointed, intending to go to Mobile, and the boat did not come, pursuant to the notification. If there was a contract, it was made at some point of time. Did it become a contract when the notification to the public was made by Heirn? or was it when that notification came to M'Caughan's knowledge? or was it when M'Caughan started to, or when he reached the place at which the boat was to stop? When it became a contract between them they were mutually bound; when did M'Caughan become bound to go to Mobile on the boat. If he has cause of action against Heirn for not carrying him, by reason of a contract on Heirn's part to do so, Heirn would have equally a cause of action against him for the passage money if he had attended and M'Caughan had declined going. There must be a mutuality of obligation. So long as M'Caughan was at liberty to decline going, so long was Heirn free to decline calling to carry him. Both were bound or neither. What consideration is there? We search for it in vain.

A carrier of passengers from one point to another is, as a general rule bound to carry any passenger who wishes to go; but that is when the carrier makes the trip. The carrier by notifying the public that he will go to a place for passengers, is in a different category from the carrier making a trip from that place. In the latter case he is actually engaged and carrying from point to point, and the passenger presents and tenders himself, by which each becomes bound. A declaration, however public, that a carrier will be at a place to prosecute his business from that point, has never been held, or before claimed, as depriving him of the right to change his mind and abandon the intent to act as a carrier from that point, or to abandon the calling of a carrier entirely.

II. The demurrer to the complaint of M'Caughan and wife,

should have been sustained.   In matters *ex contractu*, husband and wife can only join when there is an express promise to the wife and she is the meritorious cause of action.   There is nothing alleged which shows cause of action *ex delicto*.

III.  The court erred in the instructions given for the plaintiff and refused, when asked by defendant as to the criterion of damages.   In cases of contract, as a general rule, no damages but the *actual* and *immediate* damage can be sustained; in cases of *bad faith*, actual but consequential or remote damages have, in some cases been allowed, but in no case is it admissible to assess from breach of contract, exemplary or punitory damages.   Sedgwick on the Measure of Damages, 68, 69, 70, 71, 206, 210, 211, 293.

IV.  The first instruction given by the court on plaintiff's motion should have been refused.   It is, "that the written publication offered in evidence of the promise of the mail line company to send a boat into Pascagoula at the time therein referred to, is an engagement or promise that the plaintiff had the same right to rely on, as if it had been an express engagement with the plaintiff by name, provided they believe that said publication was intended, as a notice to passengers, or to the public, that passengers would be carried."

The written publication referred to is as follows:

> " *Office of the Mail Line Agency,*
> *New Orleans, Dec. 20th,* 1853.

"Postmaster, Pascagoula: Dear Sir:

This is to advise you that the mail boat, hence to Mobile on Saturday next, will stop at Pascagoula instead of the steamer Creole; you will please have a mail in readiness for Mobile,

And oblige, &c.          R. GEDDES.

By ABRAMS.

N. B.  Advise all who may feel interested in the above."

1.  If the " belief " spoken of, is to be a belief founded on the construction of the writing, it is for the court, not for the jury, to construe writings.

2.  If that belief is to rest for its foundation on parol evidence, such evidence is inadmissible to explain the writing, and there is no evidence tending to explain it.

3. It does not confine the jury to a belief founded on any evidence in the cause, whether written or oral, but leaves them to act on "belief," arising from any cause whatever.

4. The writing is not an authority to the postmaster to advertise or inform the public of the facts, but specifically confines the direction to the *postmaster's* informing "all who may feel interested in the above," viz., those who may feel interested in the fact, that instead of the Creole making her trip to Pascagoula, which was her stopping point, a mail boat would stop and carry a mail to Mobile, which was not a facility of correspondence which the place had usually.

5. It was a letter written by Abrams, a clerk of Geddes, one of the firm. There is no evidence of his authority to write it, and therefore it is not to charge the firm. Letters written by the clerk of a bank, without authority of the bank, are not evidence against it. *Bank of Kentucky* v. *Todd*, 1 A. K. Marsh. 157.

6. Had Geddes himself written the letter—although he was agent and partner—Heirn would not have been chargable as a co-partner. We must collect the scope of the partnership business from the evidence in the case, and if it did not extend to carrying passengers from Pascagoula to Mobile, Geddes could no more charge the partnership by any act or contract of his to do so, than he could bind it by a contract to proceed to Pensacola or Tampa Bay.

Now what are the facts; Geddes, Heirn and Grant, were partners in a mail line from New Orleans to Mobile. Under their winter arrangement, their business was to go with the mail-boats direct from the former to the latter place, not stopping at intermediate points. This direct transportation of the mail was their principal business, and they were bound to the government, under a penalty, to reach Mobile, on each trip, by a stated hour. On this mail line they were common-carriers of freight and passengers, from 1st of November to 1st of June, from New Orleans to Mobile, by the usual direct route. To go in to Pascagoula would have been a departure by which every policy of insurance would have been forfeited, and the company liable, to shippers and passengers for all the losses, whether in time or merchandize, that might ensue.

This being the business in which the company was engaged, it was not in the scope of the partnership to make engagements that the mail-boats should depart from the usual course of direct navigation, and stop at Pascagoula for passengers to Mobile.

But they were also partners in another business; this was the carrying of freight and passengers by way of the coast, from New Orleans to Pascagoula and intermediate landings, stopping or ending the trip at Pascagoula. Neither the Creole, which was the coast boat, nor the boats of the mail line, were employed in trips from Pascagoula to Mobile. The partnership did not extend to that. It was no part of their partnership business or employment to transport freight or passengers from Pascagoula to Mobile, between the 1st of November and the 1st of June; of this the public were fully informed by the long continued course of business, and by advertisements in the newspapers. A partner cannot bind his copartner by any contract out of the partnership business; and if the instruction was correct in point of law, and should have been given had Geddes been the defendant, Heirn being defendant, it was an abstract proposition, calculated to mislead, and which doubtless did mislead the jury.

7. It assumes the fact that Heirn or the company caused the publication to be made.

8. It assumes the fact that M'Caughan acted in faith of that publication, and did rely on it; when the evidence does not prove or tend to prove that it came to his knowledge. If it so tended, still the instruction should have been hypothetical.

V. The second instruction should have been refused. It is not hypothetical, that if the jury believe from the evidence that Heirn or the company authorized the publication, but it assumes that fact, and then decides, as a question of law, that the preparation and readiness of plaintiff to go on the boat completed the contract.

VI. The fourth instruction should have been refused. If the impracticability of reaching Mobile within the appointed time, was the reason why the boat did not go to Pascagoula, but was not a sufficient defence, in case of an express contract to go, at all events it was a defence in this case, as the primary business was to carry the mail, and that known to the public; and it was known to the

public that under the summer arrangement the mail-boats did not call on the coast, if by low tides or high winds there was danger of a failure of the boat. But if it would have been no full defence, the fact of the low tide and high wind rendering it dangerous to go in, although not impossible, and the failure of the mail, would be a good reason why exemplary damages should not be assessed, if exemplary damages might be assessed in this action under any circumstances. On the subject of the measure of damages I have already remarked.

VII. The fourth instruction of defendant should have been given. There was evidence tending to show that the boat could not have gone to Pascagoula; and if M'Caughan went to the wharf knowing that fact, there could be no pretence of cause of action.

VIII. The court erred in permitting the letter of Abrams, to the post master at Pascagoula, to be read as evidence on the testimony of Montgomery, without evidence of his authority to write it.

IX. It was error to admit evidence of Mrs. M'Caughan's pregnancy to go to the jury, in aggravation of damages. It is not laid in the complaint; defendant had no knowledge of her situation, or that she desired a passage.

X. The new trial should have been granted for the reasons assigned; and I again advert to the fact, that there was no evidence that defendant was a carrier of freight or passengers from Pascagoula to Mobile; but only that he was such carrier from New Orleans to Pascagoula, and from New Orleans to. Mobile, by the usual direct route. There is no evidence tending to prove the allegation in the petition, in that respect, and the verdict was, for that reason, without evidence.

*F. Anderson,* on same side.

The parties in their action, seem to have gone upon the idea, that they had the right to recover penal and exemplary damages from the defendant, as in case of tort or trespass ; and that his liability was not limited to the pecuniary damage which they sustained, by his failure to comply with the alleged contract of the company, of which he was a member.

Admit, for the sake of this argument, that the alleged contract

was sufficiently proved, (which is denied,) and that in *law*, it amounted to a contract on the part of the company to stop at Pascagoula, for the purpose of taking passengers to Mobile. On this contract the plaintiff alleges, that he was put to great expense, incurred by reason of the " *breach* of promise in said company;" and also, that by his " peril, exposure, and discomfort," incurred by reason of his detention on the wharf waiting for the boat, "he suffered damages to the amount," &c. And the court instructed the jury, that they had the right to give *exemplary damages*, and not merely to *compensate* the plaintiff for his loss of time, money, labor, &c. See the 3d, 5th and 6th instructions for plaintiff, as given, and the 7th and 9th instructions asked for the defendant, and refused.

For the purpose of testing the correctness of the legal principles on which the case was thus tried, let us refer for a moment to the proof. Assuming all to be proved, which the evidence tends to prove, and that the *contract*, as it is called, is sufficiently established, as well as the authority of Abrams to make it, and we have simply this state of facts: That Abrams, per Geddes, one of the partners of the firm of which defendant was a member, wrote a letter to the postmaster, at Pascagoula, stating that instead of the Creole (which was, by the winter arrangements of the company, to ply between the coast and New Orleans, not running as far as Mobile) one of the mail packets for Mobile (which by the winter arrangements, as proved, plied directly between New Orleans and Mobile without stopping) would stop (on the night of the 24th December, 1853) at Pascagoula, and that he should have a mail ready for her ; and also, notify such persons as might be interested ; and this letter was posted near the post-office door.

That this notice was given or sent to the postmaster, does not appear to have been known to the defendant therein. M'Caughan and wife and others, went to the pier or wharf about eleven o'clock at night, for the purpose of taking passage to Mobile; they remained until two o'clock, which was past the usual time of passing, and were then informed that the mail steamer had passed. This information was given by a wharf-man, whose business it was to watch for the arrival of boats. They then chose to remain until next

morning when the Creole arrived at Pascagoula,. and returned on her to New Orleans.

This is stating the case as favourably as it can be done on the evidence. As far as any moral wrong in the conduct of Heirn is involved, he is amply exculpated by the proof, which shows, that he had nothing to do with the failure to land, and that captain Grant, had good reasons growing out of the state of the weather and the tides, for not stopping at Pascagoula. Admit, however, that these reasons did not excuse him as a member of the company, from the legal liability for compensatory damages to the plaintiff, is there any pretence that he, as an individual, was liable for exemplary damages for a tort or trespass, or malicious injury inflicted by Grant. First. He is not shown even to have known that the boat was expected to stop at Pascagoula. Second. He proved that if he did know it, the conduct of the captain was prudent and judicious in not stopping.

There is no case in the books, that we have been able to find, where a jury has been permitted to assess exemplary damages, at their discretion, in cases of contract.

In " Sedgwick on the Measure of Damages," the law is thus stated : " In all cases of civil injury, or breach of contract, with the exception of those cases of *trespass* or *torts*, accompanied by oppression, fraud, malice, or negligence so gross as to raise a presumption of malice, where the jury have a discretion to award exemplary or vindictive damages; in all other cases, the declared object is to give compensation to the party injured for the actual loss sustained; and the rule of this compensation is a question of law not governed by any arbitrary amount, nor on the other hand left to the fluctuating discretion of courts and juries. By the general system of our law, for every invasion of right there is a remedy, and that remedy is compensation. Sedgw. on Measure of Damages, 27, 28.

Again, at page 36, the author says : "In *cases* of *contract* the law takes *no notice whatever of the motives* of the defaulting party; whether the engagement be broken through inability or design, the amount of remuneration is the same; and in these cases, as well as of those of torts or breach of duty of any kind, where there is no.

complaint of fraud, malice, or wilful negligence, of all the heads of loss above enumerated, (for the enumeration see page 35,) only the first and fifth are taken into consideration."

Sedgwick on Damages, p. 3. In a note he says: "There is a single exception already noticed, that of breach of promise of marriage."

Again, at page 206, he says : "It has already been stated, that our law makes a broad distinction on the subject of compensation between actions of *contract* and actions of *tort*, and while it permits the jury, in the latter case, to take into consideration the intention of the offending party, to review all the circumstances of the case, and to make their verdict conduce to the purposes of punishment as well as compensation, that on the other hand, in actions of contract the motive or *animus* of the defendant, is utterly disregarded, and the damages are strictly limited to the direct pecuniary loss resulting from the breach of the agreement in question."

Again, at page 210, he says: "No form of action has yet been devised for the *fraudulent* breach of an agreement."

It must be observed that the question here, of exemplary or punitory damages, is wholly different from that of remote or consequential damages, dependent on a breach of contract.

Compare the above principles with the instructions given and refused by the court, and especially with the 9th instruction of defendant, refused by the court, and the modification of it, which was given as follows:—"That the jury should not assess exemplary damages against defendant, unless they believe that their representations to the travelling public were false, and calculated to deceive." Not even that they were wilfully false, and intended to deceive; representations too, to which the defendant is not shown to have been otherwise accessary than as he was a partner, and bound to make them good, as a mere contract; and I think it will be manifest, that gross injustice was done the plaintiff in error.

*John Henderson,* for defendant in error.

1. We first notice the nature of this complaint, and thereby to show the rule of damages. Since the Practice Act of 1850, forms of action, as well as forms of pleading, are abolished. The statute

says in terms, the forms of civil actions are modified, only. But as the petition in every case simply relates the facts, and does not require averments to characterize the kind of action to which those facts give rise, no designation of action, nor technical averments, that would indicate the class of action to which the pleader considered the case to belong, are now required to be shown in such petition. And if the class of actions, as known to former rules, is, for any purpose, still necessary to be ascertained, the court must deduce it from the facts of the case set forth. And it is, perhaps, yet necessary, in order that the court make a correct application of the rules of testimony, and perhaps of decision, which should govern, whether it be *case*, or *trespass*, and of what sort, if either action, it may be necessary to establish, to fix the rule of law that governs, in finding the damages.

The facts imputed in our petitions, are acts of oppressive, fraudulent deception; inflicting injury, insult and indignity to the persons of the plaintiffs, and violative of a previous duty. Because we proved this duty to arise, from the written and published promise of the defendant to the public, it was argued below, and may be again here, that our right of action was simply a breach of contract, and only gave rise to the pecuniary damage expressly proven. But such is not the case made by the petitions. We charge fraud, deceit, and omission of duty, as well as breach of promise; and we ask exemplary and vindictive damages to atone for personal suffering, personal indignity, and public outrage, as well as actual pecuniary damages for extra expenses and loss of time.

This, then, is an action on the case, for fraud, deceit, falsehood, personal wrong and oppression to plaintiffs, and for wilful neglect of a duty to the public, as public carriers.

This duty does not result alone from the price paid. 13 S. & M. 368; 14 How. U. S. 485. It is imposed when undertaken to the public, even if the service to be rendered is gratuitous. Ib.; 16 How. 473.

And the rule of damages is wholly matter of discretion with the jury, over which the court has no control. 17 How. U. S. 351. Same rule in State of Mississippi. 5 Cush. 85, 86.

And in such case the range of evidence is liberally extended to

plaintiff, for, in some degree, the action is *pro bono publico*, and the plaintiff is permitted to recover private damages, which are assessed in part as punishment to the defendant, and redress to the public.   *Bell* v. *Morrison*, 5 Cush. 85, 86.

The few cases quoted above so clearly embody the principles involved in ours, that it is unnecessary to multiply them, as they might be to an almost unlimited extent.

2.  If it should be assumed, (which it was not in the court below,) that the defendant, Heirn, who was not the actor, but a partner and joint proprietor with Captain Grant, (the actor,) who was both captain and partner, is not liable for this act of fraud, deceit and oppression, we answer : the authorities are all with us. The masters, proprietors and owners, are all liable *civiliter*, for neglect, want of skill, fraud and deceit of their employees or agents while in their service, whether by the direction or consent of the principals, or expressly against both.    See 1 Com. Dig. tit. Action on Case for Deceit, 239, 240, (B.), and the Sup. Ct. U. S. in 14 How. Rep. 486, say :—"The rule of '*respondeat superior*,' or that the master shall be civilly liable for the tortious acts of his servant, is of universal application, whether the act be one of omission or commission—whether negligent, fraudulent or deceitful.    If it be done in his employment the master is liable ; and it makes no difference that the master did not authorize it, or know of his servant's act or neglect, or even if he disapproved or forbade it, he is equally liable, if the act be done in the course of his servant's employment."    *Philadelphia and Reading R. R. Co.* v. *Derby*, 14 How. 486.    And see Story on Agency, § 452.

Deceit (which is necessarily a fraud,) is defined to be "any act or demeanor which would naturally impress the mind of a careful man with a mistaken belief."

It is self-evident, then, that a public carrier who, from pledging his faith to the public incurs a semi-official duty to be just and true, betrays those confiding in them into places and positions of personal suffering and peril, must be liable for such personal wrongs and injuries.    And damages for such *torts* to the person, are exactly those ; to estimate which is the exclusive province of

the jury.    5 Cush. 85, 86; Sedg. on Damages, 35, 38-44, 488, 489, 491, 492, 493.

Did such action rest only upon breach of contract, to be compensated only to the extent of special pecuniary damage to be proven, it might be shown that the plaintiffs intending to go to Mobile only for pleasure, where they would only have spent money instead of making gain, and the money which would otherwise have been spent was saved to them by reason of defendant not carrying them. On such rule, where (as in Louisiana,) the plea of re-convention may be put in, defendants would have a right to recover of plaintiffs the amount so saved to them.    And married women, children, and young ladies, trusting to such promise for travelling, would have no right of action, though incurring sickness, or frost-bitten limbs, by exposure suffered from trusting such promises.

We pray affirmance, with 5 per cent. damages.

HANDY, J., delivered the opinion of the court.

This case is composed of two suits, one brought by John J. M'Caughan in his own right, and the other by John J. M'Caughan and Maria his wife, for grievances done to the wife; and being founded on injuries done to the parties at the same time, they were consolidated and tried together.    The material facts alleged in both complaints are the same, and in order to understand the nature of the case it will be sufficient to state the allegations of the complaint in the suit of M'Caughan and wife; which are as follows :—

That the defendant below was a co-partner with one Geddes and others in a steamboat company, plying between New Orleans and Mobile, and in the waters of the southern seaboard of this State, engaged in the transportation of freight and passengers for hire, and of the United States mails, as common carriers, to and from the cities above named and the various towns on the Mississippi sea-coast, including the town of Pascagoula, deriving their patronage and profit from freight and passengers furnished by the public; that the company, on the 20th of December, 1853, published a special notice at Pascagoula to the public, that on the 24th day of that month they would cause one of their boats to stop at

that point on her trip from New Orleans, for the purpose of taking freight and passengers thence to Mobile; that, acting upon said notice, the plaintiff's wife and himself went at the appointed time to the wharf, the usual place of landing of the boats of the company, at about eleven o'clock at night, and in time to take passage to Mobile in the boat, according to the advertisement, and remained there in waiting for the boat until day-break on the following morning, but the boat did not come, and the trip was lost to the plaintiff's wife, who was detained there for several days thereafter; that it was necessary that the parties should remain on the wharf, watching for the boat during the night, in order to get passage, and that the wharf was a most inclement place during the night, which was unusually cold, and the situation exposed and comfortless, especially for the plaintiff's wife; that by reason of the exposure she suffered great pain and anguish, and incurred much injury, her health and life being exposed to much peril and hazard. The complaint concludes in these words: "By all which means, caused by the bad faith, neglect and indifference of said steamboat company, to keep and observe their promise to the plaintiffs and to the public aforesaid, she hath suffered personal damage to the value of one thousand dollars, and to recover which is the subject of this suit."

The defendant below demurred to the complaint or declaration; and upon that, two objections are presented against the plaintiffs' recovery, which first demand our consideration.

The first of these is, that there was no direct promise made by the company or the defendant to the plaintiffs, to stop their boat at Pascagoula at the time specified; that no consideration was paid to bind them to do so, nor were the plaintiffs under any obligation to take passage in the boat at the time; and, as the obligation was not binding on both parties, that the company were at liberty to abandon their engagement to stop at that point at the time specified.

The second is, that in the suit of M'Caughan and wife the action could not be maintained, because it is one *ex contractu*, and in such cases the husband and wife can join only where there is an express promise, and she is the meritorious cause of the action.

These objections both proceed upon the assumption that the actions were founded on the special contract of the company with the plaintiffs; but we do not consider that a proper view of the nature of the actions. The substance of the complaint is, that the company, of which the defendant was a co-partner, were common carriers of freight and passengers, and as such were engaged in running their boats from New Orleans to Mobile, and the intermediate points on the Mississippi sea-coast, including Pascagoula, and that they gave notice that they would stop at that point at a specified time in the course of their business, and thereby became bound to do so; and that the plaintiffs, relying on their compliance with their promise, attended, and were ready at the proper time and place to take passage, but the company failed to perform their duty, and the plaintiffs were unable to obtain passage, and sustained damage in consequence thereof.

This shows nothing of a special contract between the plaintiffs and the company. The duty which it is alleged the company failed to perform, was that imposed upon them as common carriers, and not one proceeding from a special contract to transport the plaintiffs from Pascagoula to Mobile. It was an obligation which the company owed as well to the public at large as to the plaintiffs, by reason of their general business as common carriers and transporters of passengers; and that obligation was not changed from a general duty to a matter of special contract, by the fact that the company gave notice that they would stop at Pascagoula at a specified time, in the course of the regular business in which they were engaged, and in which the public were interested.

The character of the action must be determined by the nature of the grievance, rather than by the form of the declaration; but in this case they both indicate that the action is founded on the violation of a general duty, and not on a breach of a special contract. And wherever the action, in cases of this kind, is against a common carrier, the courts are inclined to consider it as founded in *tort*, unless a special contract be very clearly shown by the declaration. Collyer, Part. §§ 735, 736, 738. *Ansell* v. *Waterhouse*, 6 M. & S. 385; *Pozzi* v. *Shipton*, 8 A. & E. 963. It is manifest, therefore, that this action must be regarded as in the nature of an

action on the case for the violation of the duty of the company, arising from their engagements to the public. In such cases the carriers are bound by the rules of the common law to perform the work tendered them; and no consideration other than the general legal obligation resting upon them from the nature of their business, need be shown by a party who has been injured by their acts of omission or commission, whether negligent, fraudulent, or deceitful. Story on Bail. §§ 508, 591; *Philadelphia and Reading Rail Road Company* v. *Derby*, 14 How. U. S. R. 486. Their business as common carriers charges them with duties to the public, which, when violated, entitle the parties aggrieved to an action for the *tort*, which is wholly distinct from a matter of individual contract.

It is true, that the carrier has the right to abandon his business as such whenever he sees fit to do so; but whilst he holds himself out to the public as in the prosecution of it, he should be ready and willing to perform the duties appertaining to it, according to his undertaking; and in case of neglect, without some good and sufficient reason, any individual injured by a violation of his obligations, may maintain an action for the injury. 2 Kent, Com. 598, 601; Bac. Abr. title " Carriers," B.

The objections to the complaint or declaration raised by the demurrer, were therefore properly overruled.

We will proceed to consider, next, the questions raised upon the instructions granted in behalf of the plaintiffs, and upon those asked by the defendant and refused.

The first instruction excepted to is as follows:—

" That the written publication offered in evidence of the promise of the mail line company, to send a boat into Pascagoula at the time therein referred to, is an engagement or promise that the plaintiffs had the same right to rely on, as if it had been an express engagement with the plaintiffs by name: Provided, they believe that said publication was intended as a notice to passengers or to the public that passengers would be carried."

In order to judge of the propriety of this instruction, it is necessary to advert to so much of the evidence as relates to it.

It appears that the defendant and three other persons, Grant, Geddes and Day, were co-partners in running a line of steamboats

from New Orleans to Mobile and certain points on the Mississippi sea-coast, carrying freight and passengers and the United States mail, to and from the several points at which they touched; that, during the winter season, Pascagoula was not one of the points at which the boats of the line running to and from New Orleans and Mobile, were advertised to stop *at stated times* for taking freight, passengers and mails, the business of the company at that point being, for the most part, during the winter season, performed by one of their boats, called the "Creole," which plied between that place and New Orleans; but that it was their custom to stop their boats running between New Orleans and Mobile, at the places on the coast, upon giving notice by advertisement; that on the 21st December, 1853, the Postmaster at Pascagoula received from the office of the Mail Line Agency the following letter, which was brought by one of the boats of the Company, and delivered by the mail messenger from the boat:—

"Office of the Mail Line Agency, New Orleans, Dec. 20, '53.

"Postmaster, Pascagoula: DEAR SIR—This is to advise you that the mail-boat hence for Mobile on Saturday next, will stop at Pascagoula, instead of the steamer Creole. You will please have a mail in readiness for Mobile to go by said boat, and oblige, &c.

R. GEDDES,

By ABRAMS.

"N. B.—Advise all who may feel interested in the above."

which letter was proved to be in the handwriting of Abrams, the confidential clerk of the company at New Orleans, Geddes being both agent and co-partner; that the letter was posted up near the post-office door immediately after its reception, and was known to the citizens of the place, and acted upon by some of them. It was further proved that notices of the voyages of the boats of the company were usually issued from the office of Geddes in New Orleans, and that Geddes stated that the Florida, one of their boats, was to go to Pascagoula on the 24th December, 1853; but that Grant, the captain of that boat, stated, before he left New Orleans, that he would not stop at Pascagoula that night, but would run according to the *regular* advertisement, and that Geddes had no right to engage the boat to go where she was not ad-

vertised. to go ; and that if there was any damage occasioned by the failure to stop in this case, Geddes ought to pay it. It further appears that the plaintiffs acted on information obtained at Pascagoula, that one of the boats would stop there on the night stated, the source of which was the letter to the postmaster, which was made public; and that the plaintiffs and several other persons remained on the wharf during the whole night, exposed to severe cold and much suffering, waiting to take passage to Mobile; but that she passed by without stopping.

We will now examine such of the objections to the instruction as appear to us to have any force.

And the first that we will notice is, that the instruction assumes it as proved that the letter to the postmaster was the act of the company, and written by their authority, instead of submitting that question to be decided upon the facts of the case by the jury.

The evidence shows clearly that the letter was written by the clerk of the company, and was forwarded and delivered by one of their boats; that it was the practice with them for announcements of trips of their boats to be issued from their office from which this letter was written, and that their agent and co-partner acknowledged that their boat was to go to Pascagoula on the 24th December, and that Grant, the captain, said, before leaving New Orleans, that he would not go there that night, and that if any damage was sustained by the failure, it should fall upon Geddes. This shows fully that the appointment and notice of the stopping of the boat at Pascagoula at the time specified, were made and issued by the authority of Geddes, the co-partner, and according to the practice of the office of the company in ordering their trips. And there is no evidence tending to show that the notice was not issued from the office of the company, and by the direction or sanction of Geddes. Nor does that point appear to have been contested on the trial in the court below. There could, therefore, be no impropriety in treating the appointment and notice as the engagement of the company, provided Geddes was competent to charge his co-partners by the act.

But it is insisted that, though the letter was written by the authority of Geddes, the act was not binding upon the firm or upon

the individual members of it, because it was beyond the scope of the partnership business, which did not extend to carrying passengers from Pascagoula to Mobile; that their business in which they were engaged, was to go with the mail-boats direct from New Orleans to Mobile, without stopping at intermediate points, in the winter season; and that the public had notice of this, by the general course of business of the company, and by advertisements in the newspapers; and, therefore, that Geddes had no power, either as a co-partner or as agent of the firm, to bind his co-partners by an act so foreign to the proper business of the company.

It is true that a partner cannot bind the firm by an act clearly not within the partnership business; yet he has power to bind the firm in all parts of the business in which it is engaged, and in all transactions, whether direct or incidental, appertaining to its business. And though the partner exceed the terms of the partnership, yet so far as third persons having transactions with them, without notice, are concerned, the co-partners are bound, if the transaction be such as third persons may reasonably conclude to be embraced within the partnership business, or be incident or appropriate to such business, according to the ordinary course and usage of carrying it on. Collyer on Part. § 384. In transactions which, from their nature, appear to the world to be legitimately connected with the business of the partnership in which they are openly engaged, arrangements between the partners cannot affect their ordinary responsibilities to third persons who have not assented to such arrangement, or have not had notice of it. Ib. § 386, et seq. The formation of the partnership and the apparent inclusion of the particular transaction within the kind of business pursued by the firm, import a general authority held out to the world, to which the world has the right to trust. Winship v. Bank U. S., 5 Peters, 529, 561.

It appears by the evidence in the record, that from the 1st November to 1st June, the regular course of the mail-boats belonging to the company, as advertised in the newspapers at New Orleans, was not to stop at any point on the coast, on their trips from New Orleans to Mobile. But it is shown by the testimony of the clerk of the boat, whose failure gave rise to this suit, that

Heirn *v.* M'Caughan et ux.

it was the custom of the mail boats to land on the coast, whenever they advertised to do so at any particular point, and to comply, unless in the judgment of the captain and pilot it would endanger the prompt arrival of the mail.    Thus it appears that, although the *general* course was not to stop at the points on the coast in the winter season, yet it was their practice to make *special appointments* to stop and to comply with them, unless prevented by good causes.    This is shown to have been the custom of the company; and it must be presumed to have been relied on by the community, whenever notices were given of these special stoppages.    Not only, then, were these special stoppages apparently within the business in which the company was engaged, but it was their practice to make them as a part of their regular and legitimate business upon notice given to the public that they would do so; and it cannot be said that they were not as much bound for the legal consequences of such appointments as they were for those appertaining to their engagements at New Orleans and Mobile.

Another objection urged against the instruction is that it did not confine the jury, in determining the question, whether the publication was intended as a notice that passengers would be taken on the appointed trip, to the evidence before them, but left them to act on their belief from any cause.

This objection does not appear to have been made to the instruction when it was given.    The evidence tended clearly to show that the transportation of passengers and freight from the points at which the boats of the company touched, as well as the conveyance of the mails, was a material part of the business in which they were engaged; and that does not appear to have been contested on the trial.    The jury were, therefore, well warranted in believing that the appointment and notice in question, were made with reference to both of these objects.    And though the objection, which is rather literal than substantial in its character, might have been sustained before verdict, yet after verdict, and when the finding upon the point appears to be sustained by the evidence, it is too late to raise such an objection, and give it the effect of setting aside the verdict.    The presumption is that the verdict was found on the evidence, because the evidence warranted the finding.

It is also objected, that the letter could not be considered as a notice to take passengers, but must be held to have reference only to taking the mail, and to persons interested in transmitting letters and papers by the mail; and further, that it was not competent to explain, by evidence apart from the letter, what was intended by the postscript to the letter, to "advise all who may feel interested in the above." But these objections are manifestly untenable. It was certainly competent to show what class or classes of persons were intended to be embraced in the general expression, "all who may feel interested," in the notice. And the persons intended to be notified must have been such as were concerned in the ordinary business in which the mail line company were engaged. If that business was both to carry mails and to transport passengers at the same time, it was competent to show that fact, in order to understand the persons for whom the notice was intended.

Nor can the letter and postscript be properly considered as having reference only to the mail and persons interested in that. The language is general, that all "*who might feel interested*" in the fact that a mail boat would stop at Pascagoula, at the time appointed, should be advised thereof. If they were interested in any other manner than with respect to the mail, they are embraced within the general language used. And it is plain that the notice was intended for others than those interested in the mail, because it was the business of the postmaster to give notice of the fact, that an extra mail would leave that point at the time appointed; and it is not to be presumed that the mere carriers of the mail intended to direct him as to a matter connected with his duty. Something more than this was clearly intended.

The question was, whether the mail line company were under a legal obligation to stop at Pascagoula at the time specified, and to take passengers on their boat to Mobile. In determining that question, it was proper to consider not only the letter making the appointment, but the circumstances under which it was written, if necessary to a correct understanding of it, and the business in which the company was engaged and with reference to which it was written; and upon no just principle, could the extent of the obligation be confined to the letter itself. Moreover, there was no

Heirn *v.* M'Caughan et ux.

objection to the admission of the parol evidence upon this point, and no motion to exclude it or to direct the jury to disregard it.   And upon this ground, it was proper to be considered by the jury.

The second instruction given at the instance of the plaintiffs is objected to, because it assumes that the company authorized the letter, or were bound by it.   This objection has already been considered, in what is above said upon the first instruction ; and for the reasons then stated, no prejudice was done to the defendant by the reference in this instruction to the notice and publication of the stoppage of the boat.

The next objection is to the fourth instruction, which is as follows : " That no engagement of said steamboat mail line as carriers of the mail, is any extenuation or excuse for their breach of promise to the plaintiffs, made by their written engagement given in evidence in this suit."

This instruction is objected to on the grounds, First, that it was the primary business of the company to carry the mail ; and that, if there were just grounds for believing that they would fail in their obligation to deliver the mail in due time at Mobile, by reason of the boat's stopping at Pascagoula, according to the appointment, the boat was justifiable in not complying with the appointment ; and Second, that the obligation to deliver the mail, and the danger of failure therein, in consequence of the state of the winds and weather at the time, were sufficient reasons why exemplary damages should not be awarded.

This objection proceeds upon the assumption that the paramount obligation of the company was to carry the mail.   But that does not appear to be sustained by the evidence.   On the contrary, for aught that appears, the company were as much bound to transport passengers as to carry the mails in their boats.   Both of these branches of business appear to have been equally objects of pursuit and profit by the company ; and the rights of the public were independent of those of the United States.   In the absence of any statute regulations or of any special contract, the obligations entered into to the United States could not impair the obligations of the company to individuals, in the due course of their business ; and if the company thought fit to incur obligations to different

parties, the performance of which might be incompatible with each other, both parties being entitled in equal right, it would be no excuse to the party aggrieved by the default, that the company could not perform both obligations, and thought proper to perform that to the other party. For each party had an equal right to performance of the obligation; and it was the misfortune or fault of the company if they undertook incompatible obligations; but no ground of immunity from either of them.

If, therefore, it was the duty of the company to send their boat to Pascagoula at the time specified, as a carrier of passengers and freight, according to the course of their business, they had no right to disregard that obligation, and to excuse themselves because they were unable to perform that obligation and, also, the contract which they had made to carry the United States mail. And it was for the jury to determine, upon consideration of all the circumstances, whether of mitigation or of aggravation, what damages should be awarded to the party aggrieved, by the delinquency.

We think, therefore, that there was no error in this instruction.

Again, objection is made to the refusal of the fourth instruction asked by the defendant, which is that "if the plaintiffs went to Pascagoula, knowing that the boat would not or could not stop there on the night of the 24th December, 1853, with a view to seek an advantage, or to get a cause of action, so as to enable him to sue the defendant for damages, the verdict should be for the defendant."

There appears to be no evidence tending to show that M'Caughan went to Pascagoula with the knowledge or intention here supposed. For he did not know of the appointment until he arrived there; and he had made arrangements to go to Mobile otherwise, until he learned that the mail-boat would stop on her trip to that place at the time specified. There is nothing whatever to show that he supposed that the boat would not or could not comply with the appointment. Indeed, his entire conduct shows quite the contrary. There was, therefore, no evidence upon which the instruction could be properly predicated; and that is a sufficient reason

for its refusal; for it could have had no other effect than to suggest to the jury facts which were not in evidence before them.

The last objection to the instructions which we will notice, applies to those in relation to the rule of damages.   The sixth instruction given at the instance of the plaintiffs, is as follows :—

" If the jury believe from the evidence that the plaintiffs, rely-ing upon the written publication of the defendant, did await on the wharf, and at the usual place for the arrival of the mail-boat promised, and said boat did not come in ; and that said publication was false and calculated to deceive and did deceive the plaintiffs, they may assess such damages for such false publication and deceit as in their discretion they may consider the plaintiffs suffered by such falsehood and deception.

On the contrary, the following instructions were asked in behalf of the defendant, and refused:  "Seventh.  That if the jury shall believe from the evidence that the plaintiffs are entitled to recover any damages; then the true rule of estimating such damages is the actual amount of pecuniary loss sustained by the plaintiffs for money paid out and for their time lost."

"Ninth.  That the true rule of estimating damages for the non-per-formance of contracts or duties created or imposed by the law in which there is no element of fraud, wilful negligence or malice, is the direct pecuniary loss which includes no more than the money actually expended, and fair compensation for the time lost by the plaintiffs in this case, and the jury should be governed by this rule in estimating the damages in this case."

Instead of this last instruction, the court gave the following:— " That the jury should not, in this case, assess exemplary damages against the defendant, unless they believe that their representa-tions to the travelling public were false and calculated to deceive and did deceive the plaintiffs."

The objection to the rulings of the court, upon these instruc-tions, assumes that the action was founded on the *special contract* of the mail line company.   We have above seen that such is not a proper view of the nature of the action, which is one of *tort* for the personal grievance done to the plaintiffs by fraud, gross negligence or oppression.   And in such cases, it is now too well settled to

admit of controversy, that the jury may, in their discretion, award such damages by way of punishment, or for the sake of example, as they may think that the peculiar circumstances of the wrong to the plaintiff justifies. Sedgwick on Damages, 38, 39, et seq.; 489, et seq.; *Bell* v. *Morrison*, 27 Miss. 68; *Vicksburg and Jackson Railroad Co.* v. *Patton*, 3♦ Miss. R. 156.

There was testimony tending to show that the captain in charge of the boat, which was published to stop at Pascagoula, at the time specified, wilfully and capriciously disregarded the obligation incurred by the publication; and that the failure occasioned great bodily exposure and mental suffering and disappointment to the plaintiffs. These circumstances were properly submitted to the jury, to be considered by them, together with the circumstances of excuse or extenuation relied upon by the defendant; and it was their province to determine whether there was such fraud or wilful neglect of duty, causing oppression to the plaintiffs, and under such circumstances of aggravation as to warrant exemplary damages. This was the substance of the rulings of the court upon this point; and we perceive no error in them.

Exception was taken on the trial to the admission of evidence of the peculiar condition of health of Mrs. M'Caughan at the time of the grievance; and it is now contended that this evidence was inadmissible because her peculiar bodily condition was not alleged in the declaration as a circumstance of aggravation.

The action was for *general* damages arising directly from the grievance complained of, and as the necessary effect of the wrong. In such cases, the law implies or presumes damages to have accrued from the wrong, and it is not necessary to state the particular circumstances of aggravation in the declaration. 1 Chitty, Pl. 428; *Burrus* v. *Madan*, 2 John. R. 149. The rule is otherwise where the damage sustained has not necessarily accrued from the act complained of, and consequently is not implied by law. In such cases it is necessary that the declaration should state the special damage complained of, in order to prevent surprise on the defendant. 1 Chitt. Pl. 428.

The condition of the plaintiffs' health is not alleged to be the special ground of the wrong, but it was proved on the trial as a

circumstance of aggravation of the wrong, and to show how grievously the act, which was wrongful in itself, operated to the bodily distress of the plaintiff and his wife.   This was entirely competent under the pleadings.   Sedgwick on Damages, 210.

It remains only to' consider the  grounds upon which it is urged that a new trial should have been awarded on the defendant's motion, and which have not already been considered.

First.  It is said that, as there was no evidence tending to show that Heirn had any actual participation in making the appointment for the stoppage of the boat at Pascagoula, or in giving the notice, or in the failure, he could not be held responsible, though his co-partners, Geddes and Grant might be; for one partner is not chargeable with the *tort* of his co-partners, done without his knowledge.

This would be true if the wrongful act was wholly unconnected with the partnership business.   But where it is connected with the business of the firm, and is incident to it as the business is carried on, the *tort* of one partner is considered the joint and several *tort* of all the partners; and the partner doing the act is considered as the agent of the other partners.   And it is held that, in such cases, all the members of the firm may be sued, or any one of them may be sued alone.   Collyer on Part. § 457.

The evidence here was sufficient to sustain the finding of the jury, that it was the practice of the company to land their boats which plied from New Orleans to Mobile, at points on the intermediate coast, upon giving special notice thereof; and though this was done only occasionally during the winter season, it was a part of the business in which the company were engaged, and legitimately connected with it.   But there is also testimony tending to show that the duty of publishing the voyages of the boats of the company was intrusted to Geddes, from whose office the announcement in this case was made.   And whether he is regarded as acting as partner or agent, his acts connected with the business of the company, are chargeable either against all or any of the partners; and, of course, any of the partners is chargeable *civiliter* to the same extent to which his co-partner would be bound.  If there has been an abuse of the authority exercised by the partner, that may

Heirn v. M'Caughan et ux.

be a matter to be settled between the partners. But the rights of third persons whose rights are affected by the transactions of one partner acting for the firm, in the course of its legitimate business, depend upon wholly different principles.

Secondly. It is contended that exemplary damages should not have been awarded, because the danger of landing at Pascagoula, by reason of the low tide and high wind at the time, was a sufficient excuse for not complying with the engagement; and at all events, that these facts show an absence of such gross neglect or wilful violation of the engagement as would entitle the plaintiffs to exemplary damages.

As to the practicability of making the landing at the time, the testimony is conflicting, and it was for the jury to determine whether they would credit the witnesses for the plaintiffs or those for the defendant. It is plain that they acted upon the testimony of the former; and their finding is conclusive of the fact, under the circumstances in which it was presented for their determination.

It also appears that the question of gross neglect or wilful violation of duty, was submitted for their decision upon the evidence and instructions. And upon that point, in addition to the superior weight which they gave to the testimony of the plaintiffs' witnesses bearing upon it, there was also evidence showing that Grant, the captain of the boat, whose duty it was to stop, declared, before leaving New Orleans, and before he could have known of the dangers of landing arising from the stormy weather, that he would not comply with the engagement. And considering all the evidence upon the point, we cannot say that the jury acted erroneously in finding as they did.

Having thus considered the several grounds of error insisted upon, we are brought to the conclusion that there is nothing in the record which would justify a reversal of the judgment; and it is accordingly affirmed.