611 So.2d 889 (1992)
BETA BETA CHAPTER OF BETA THETA PI FRATERNITY
v.
Abby Anderson MAY.
No. 89-CA-1147.
Supreme Court of Mississippi.
December 17, 1992.
Rehearing Denied February 11, 1993.
*890 Ken R. Adcock, Mark D. Morrison, Shell Buford Bufkin Callicutt & Perry, Jackson, for appellant.
S. Allan Alexander, Grady F. Tollison, Jr., Tollison, Austin & Twiford, Oxford, Kenneth M. Burns, Okolona, for appellee.
En Banc.
PITTMAN, Justice, for the Court:
Abby Anderson May (hereinafter "May") filed a negligence action against the Beta Beta Chapter of Beta Theta Pi Fraternity (hereinafter "Beta"), an unincorporated association, and the Beta Beta House Corporation (hereinafter "Corp."), a non-profit corporation.[1] May requested actual and punitive damages for a personal injury she sustained while attending a social function at the fraternity house. In the complaint, May alleged that the defendants were negligent in designing and constructing a temporary pool on the premises creating a dangerous condition of which she was not warned, and in furnishing alcohol to persons under the age of twenty-one in violation of Mississippi law and University of Mississippi (hereinafter "UM") policy. May also alleged that Corp. was negligent in failing to properly supervise Beta.
The jury returned a verdict in favor of May against Beta awarding her $50,000 in actual damages and $100,000 in punitive damages. Beta, aggrieved by the lower court judgment, appeals raising several assignments of error. Finding no reversible error, this Court affirms.

I.
On April 19, 1986, the Betas held their annual "Ole Man River" party. They constructed a pool beneath the deck of their house and a paddle wheel in order to depict a riverboat setting. The Betas used timber, sandbags and visquine to construct the pool. The UM fire department filled the pool with water to a depth of approximately *891 6.5 feet. The pool was approximately 15-20 feet wide and 30-40 feet long. The sides of the pool angled in toward the bottom. Once the pool was filled with water, it was evident that the pool leaked.
May, an eighteen-year-old freshman, received a formal invitation to the party because she was a "little sister" of the fraternity. Jeff Lottman, a Beta pledge and UM freshman, escorted May to the party that afternoon. When they arrived at approximately 12:30 p.m., May was drinking a Coke. Lottman got her some Seagram's and she poured it into her Coke. May testified that she only took three drinks and set the cup down. Although it was against UM policy, the Betas served beer at the party. According to May, she only had one beer the entire afternoon.
As the party progressed, the pool continued to leak. During the party, people were being thrown into the pool. At approximately 3:30 p.m. when May got her second beer, she was grabbed by at least two unknown young men. She resisted because she did not want to go into the water, but they stood her up on the railing, pushed her in the back, and she landed stiff-legged in the pool with all of her weight on her right foot.
May called for help. Lottman and Clyde Edwards, a Beta, came to her aid. They lifted her from the pool. Someone at the party called an ambulance, but David Roberts put May in his car and took her directly to the hospital.
As a result of being thrown into the pool, May suffered a compound fracture to her right heel bone. The bone was sticking out through the skin. Dr. Wayne Terry Lamar, an orthopedic surgeon, treated May's injury once she arrived at the hospital. Dr. Lamar took May into surgery to properly place the bone. The wound, however, was left open because it was contaminated. Three days later the wound was closed and May was discharged on April 27.
On May 5, 1986, she returned to have the stitches removed. A cast was also applied. On May 7, however, she developed an infection, and she was hospitalized until May 16. Dr. Lamar determined that May had a twenty percent impairment to her right foot which converts to a six percent impairment to the body as a whole.

II.
Beta contends that as an unincorporated association, it is not a suable entity and argues the following:
The common-law rule as to suits by and against unincorporated associations has been changed and modified in most jurisdictions by statutory enactments permitting such associations to sue and be sued in their adopted name, or in the names of their officers, trustees, committees, and the like. Under some statutes it is optional with the creditor to proceed against the association as such, or against the individual members composing it. Still other statutes authorize actions against, but not by, certain associations.
Such statutes are constitutional and are to be construed in the light of the purpose of their enactment. But it has also been held that the statutes since they are in derogation of the common law, demand strict compliance; and they have no extraterritorial force or effect.
A statute or rule permitting an unincorporated association to sue or be sued in the associate name, or in the name of its officers, is procedural only. It creates no new substantive right where none existed before its adoption, and this is true whether the action is in contract or tort... .
6 Am.Jur.2d Associations and Clubs § 52 p. 486-88 (1963).
Beta is an unincorporated association which exists solely by virtue of Miss. Code Ann. § 37-111-1 to -11 (1972). These statutes do not provide that the association may sue or be sued in its chosen name.
The United States Supreme Court addressed the suability of unincorporated associations in United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, cert. denied, 42 S.Ct. 587 (1922). In determining that local unions as unincorporated associations *892 were suable, the United States Supreme Court stated:
Undoubtedly, at common law, an unincorporated association of persons was not recognized as having any other character than a partnership in whatever was done, and it could only sue or be sued in the name of its members, and their liability had to be enforced against each member... . But the growth and necessities of these great labor organizations have brought affirmative legal recognition of their existence and usefulness and provisions for their protection, which their members have found necessary. Their right to maintain strikes, when they do not violate law or the rights of others, has been declared. The embezzlement of funds by their officers has been especially denounced as a crime. The so-called union label, which is a quasi trademark to indicate the origin of manufactured product in union labor, has been protected against pirating and deceptive use by the statutes of most of the states, and in many states authority to sue to enjoin its use has been conferred on unions. They have been given distinct and separate representation and the right to appear to represent union interests in statutory arbitrations, and before official labor boards... . More than this, equitable procedure adapting itself to modern needs has grown to recognize the need of representation by one person of many, too numerous to sue or to be sued ... and this has had its influence upon the law side of litigation, so that, out of the very necessities of the existing conditions and the utter impossibility of doing justice otherwise, the suable character of such an organization as this has come to be recognized in some jurisdictions, and many suits for and against labor unions are reported in which no question has been raised as to the right to treat them in their closely united action and functions as artificial persons, capable of suing and being sued.
Id. at 385-88, 42 S.Ct. at 574-75, 66 L.Ed. at 984-86 (citations and footnote omitted).
The Court further held:
Though such a conclusion as to the suability of trade-unions is of primary importance in the working out of justice and in protecting individuals and society from possibility of oppression and injury in their lawful rights from the existence of such powerful entities as trade-unions, it is, after all, in essence and principle, merely a procedural matter. As a matter of substantive law, all the members of the union engaged in a combination doing unlawful injury are liable to suit and recovery, and the only question is whether, when they have voluntarily, and for the purpose of acquiring concentrated strength and the faculty of quick unit action and elasticity, created a self-acting body, with great funds to accomplish their purpose, they may not be sued as this body, and the funds they have accumulated may not be made to satisfy claims for injuries unlawfully caused in carrying out their united purpose.
Coronado, at 390-91, 42 S.Ct. at 576, 66 L.Ed. at 987 (emphasis added).
In Varnado v. Whitney, 166 Miss. 663, 147 So. 479 (1933), this Court followed the decision in Coronado. In concluding that the Brotherhood of Railroad Trainmen was suable, this Court held:
In consonance with other courts, this court has repeatedly held that, at common law, an unincorporated association is not suable in its own name, consequently this association is not so suable, unless that rule has been changed by statutes, either expressly or by necessary implication.
In many, if not all, respects this brotherhood is an association of the kind and character of the United Mine Workers of America, which was held suable in its own name by the Supreme Court of the United States in United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762, for the reason that federal statutes which recognize the legal entity of such associations, grant them rights, and impose liabilities on them, impliedly *893 authorize them to sue and be sued in their association names.
Id. at 669, 147 So. at 480.
This Court further held in Varnado that the Brotherhood was also impliedly suable under §§ 5231-68 of the Mississippi Code (1930) which today is contained in Miss. Code Ann. §§ 83-29-1 to -75 (1972) entitled Fraternal Societies. Id. Section 83-29-31 (formerly § 5246 Mississippi Code (1930)) specifically provides for service of process on such associations. There is, however, no such provision contained in the sections covering Beta entitled Fraternities, Sororities and Other Societies. Miss. Code Ann. §§ 37-111-1 to -11 (1972).
The line of cases holding unincorporated associations suable deals with organizations such as labor and trade unions. The case at hand, however, deals with a purely social organization. Obviously, the legislature in providing two separate sets of statutes to cover these types of organizations realized the different nature of these organizations. In Daniels v. Sanitarium Association, Inc., 59 Cal.2d 602, 30 Cal. Rptr. 828, 381 P.2d 652 (1963), the Supreme Court of California held that an unincorporated association could file suit in its own name. In so holding, however, the Court stated:
The trade union has grown from the early loose craft union into an institution comparable to a corporation or public utility. Indeed this court has said that the union may no longer be regarded as a mere fraternal organization or social club. ... The legal evolution of the status of the union has occurred both by statutory and decisional recognition of the metamorphosis in its composition and function.
Id. at 604-05, 30 Cal. Rptr. at 830, 381 P.2d at 654 (emphasis added) (citation and footnote omitted).
In Payne v. Sigma Phi Epsilon, 569 F. Supp. 422 (N.D.W. Va. 1983), the court held that the fraternity as an unincorporated association was not suable:
Under West Virginia law, "in the absence of a statute authorizing such procedure an unincorporated society or association cannot be sued as an entity by its name, nor can a judgment be rendered against it merely by name." Simpson v. Grand International Brotherhood of Locomotive Engineers, 83 W. Va. 355, 98 S.E. 580, cert. denied 250 U.S. 644, 39 S.Ct. 494, 63 L.Ed. 1186 (1919)... . The only unincorporated associations which may sue or be sued under West Virginia law are cooperative agricultural marketing associations and common carriers... . Members of an association may sue or be sued as individuals and judgment rendered against such of them as are served with process for participation in any activity of any association which operates to wrong another in his person or property... . A class action may also be maintained against one or more individuals who afford adequate representation of all members of an unincorporated association as a class.
Id. at 425.
As previously noted, however, an express statutory provision is not always necessary. See Varnado, 166 Miss. at 669, 147 So. at 480.
An express statutory provision is not indispensable to an association's capacity to sue or be sued in its association name; such a suit may be maintained by virtue of a necessary implication arising from statutory provision, as in cases where an unincorporated association is recognized as a legal entity by statutes which do not in terms authorize it to sue or be sued as such. Thus an unincorporated association authorized by statute to contract in its own name for certain purposes, has a legal capacity to be sued on such contracts in its association name. However, the mere fact that voluntary unincorporated associations have been accorded some power or privilege of a nature consonant with their special purposes or activities, not enjoyed by individuals or partnership in the usual course of affairs, will not support an implication that the legislature intends such an association to have capacity to sue or be sued in the association's name.
*894 6 Am.Jur.2d Associations and Clubs § 52 p. 488 (1963) (footnotes omitted).
Although there is no statute specifically providing that Beta is a suable entity, Beta is permitted by statute to create its organization. Beta is given the power to lease in § 37-111-9, and there is certainly no statute stating that Beta cannot be sued. This Court recognizes that an organization such as Beta influences and affects many lives of our citizens. Beta "does business" at public and private institutions, and it is part of our economic and social fabric. This Court draws a necessary implication, from the statute authorizing Beta's creation and the fact that it influences the lives of our citizens, that Beta be part of our legal fabric. To hold that Beta cannot be sued is to ignore the obvious viability of its organization and to deny the reality of Beta's legal existence. In holding that Beta can be sued, this Court is lead by Varnado. "Statutes which recognize the legal entity of such associations, grant them rights, and impose liabilities on them, impliedly authorize them to sue and be sued in their association names." Varnado at 669, 147 So. at 480. Accordingly, this Court finds that Beta is a suable entity and that such authority can be implied from the statutes recognizing Beta as a legal entity. Miss. Code Ann. §§ 37-111-1 to -11 (1972).

III.
Beta also contends that the lower court erred in granting Jury Instruction P-10B which reads as follows:
Punitive damages are additional damages that may be awarded to punish or to compel the wrongdoer to have due and proper regard for the rights of other persons or to warn and deter others from repeating the same acts.
If you find from a preponderance of the evidence that the acts or inactions of the Defendant Fraternity (1) in failing to control its members or guests or (2) in allowing the illegal consumption of alcohol or the consumption of beer against University regulations or (3) in allowing the seepage of the pond to continue lowering the water level and yet continuing to allow members or guests to throw persons such as Abby Anderson May into the pond and that Abby May was thrown into the pond against her will while resisting, and you further find such act or failure to act was grossly negligent, indicative of a wanton and willful disregard of the rights of Abby Anderson May and if you further find that any such action or failure to act proximately caused or contributed to Abby May's injury, you may award punitive damages to the Plaintiff against the fraternity. The amount of punitive damages, if awarded, should be a sum sufficient to deter the Defendant Fraternity and others similarly situated from acting in such a manner in the future.
Beta objected to P-10B on the basis that May failed to show evidence of gross negligence or of willful or wanton conduct by Beta and that May failed to put on any proof of net worth.

A. WAS THERE EVIDENCE OF GROSS NEGLIGENCE WITH RECKLESS DISREGARD, OR OF WILLFUL OR WANTON CONDUCT ON THE PART OF BETA?
Punitive damages are only to be assessed in "extreme cases." Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983). Furthermore, since punitive damages are assessed as an example and warning to others, "they should be allowed only with caution and within narrow limits." Consolidated American Life Ins. Co. v. Toche, 410 So.2d 1303, 1304-05 (Miss. 1982).
Regarding the question of the jury being authorized to award punitive damages, this Court has set out the guidelines for such authority by the jury in many cases; the rule being that "punitive damages are ordinarily recoverable only in cases where the negligence is so gross as to indicate reckless or wanton disregard of the safety of others." Belk v. Rosamond, 213 Miss. 633, 57 So.2d 461 (1952).
*895 U.S. Industries, Inc. v. McClure Furniture Co. of Eupora, 371 So.2d 391, 393 (Miss. 1979).
In Curtis v. Mississippi State Highway Commission, 195 So.2d 497 (Miss. 1967), this Court discussed the distinction between simple negligence and willfulness or wantonness:
The fact that the damage is alleged to have been the result of the wilful acts of the Commission is a far more serious charge than simple negligence. See 38 Am.Jur. Negligence § 48 (1941).
This Court in Raney v. Jennings, 248 Miss. 140, 147, 158 So.2d 715, 718 (1963), stated:
Willfulness and wantonness connote knowingly and intentionally doing a thing or wrongful act. This means actual knowledge on the part of the appellee....
The same theory is carried forward in Covington v. Carley, 197 Miss. 535, 541-542, 19 So.2d 817, 818 (1944), in which we said:
Indeed, negligence and willfulness or wantonness are incompatible terms... . Otherwise expressed, wantonness is a failure or refusal to exercise any care, while negligence is a failure to exercise due care.
Curtis, 195 So.2d at 502.
P-10B set out three specific allegations of misconduct on behalf of Beta:
(1) failing to control its members or guests
(2) allowing the illegal consumption of alcohol or the consumption of beer against University regulations
(3) allowing the seepage of the pond to continue, lowering the water level and yet continuing to allow members or guests to throw persons such as Abby Anderson May into the pond and that Abby Anderson May was thrown into the pond against her will while resisting.
Beta contends that there was no evidence to support these allegations, and as a result, the lower court erred in granting the jury instruction. None of the witnesses specifically testified that people at the party were out of control due to the consumption of alcohol. Furthermore, the Betas had constructed the pool in the past and had not experienced any problems with people getting injured. Beta contends that it was not on notice that the pool was dangerous. Thus, May's injury was not the result of wanton or willful negligence, but one of simple negligence.
Although there was no testimony as to any specific effect the consumption of alcohol had at the party, the Betas were serving beer (and either serving or allowing other alcoholic beverages to be served) in violation of UM policy. At the time of the party, it was illegal for people under the age of 21 to consume alcohol; those over 18 could legally consume beer. UM, however, had a policy against the consumption of beer on state property. The Betas discussed the UM policy, they knew that it was a violation of policy to serve and consume alcohol at this party. However, since the policy seemingly was not enforced, they continued to serve beer at social functions. Beta was also aware that the pool was leaking and that the water level was falling. Further, the pool was of make-shift construction to say the least, the side walls were inverted and very irregular, alcohol abounded over an extended period of time, and according to Jeffrey Holt Shaw, a Beta, approximately 50 girls were thrown into the pool during the party.
According to May, she made it known that she did not want to go into the water. She testified as follows:
I grabbed ahold to the boat-like structure, and I was screaming and kicking and telling them I didn't want to go in, and they pried me loose, and they told me if I didn't be still that I'd get hurt, and they took me ... I was on the other end of the deck from the pool ... and they took me all the way across. They stood me up on the top rail, and I got back down to the bench part of it, and they grabbed me again, and stood me back up and pushed, and I, when I stood up, I knew something was wrong with my foot because it didn't feel right.
The distance from the railing from which May was pushed to the ground was approximately *896 nine feet. At the time she was pushed into the water, it was approximately 3.5 feet deep.
The Betas were on notice that the water level in the pool was falling and that girls were being thrown into the pool against their will. The Betas knew that they were serving beer in violation of UM policy and to persons possibly under age. This is not a case of simple negligence. May was deliberately thrown into the water against her will. The actions of the young men that pushed May into the water were willful and wanton. Beta not only failed to exercise due care, but it failed to exercise any care in properly supervising the party, making the pool safe, abiding by UM policies regulating such parties and possibly serving alcohol to under age persons. This conduct shows that Beta acted with gross negligence in reckless disregard for the safety of others.

B. WAS THERE SUFFICIENT EVIDENCE OF BETA'S NET WORTH?
May presented three of Beta's bank statements. The bank statements indicated the following balances:
(1) 9/30/88  $9,973.77
(2) 3/31/89  $4,614.21
(3) 4/30/89  $3,601.40
Lottman testified that Beta had approximately 60 to 70 active members and 20 to 40 pledges. They each paid dues of $235.00 per month. Thus, depending on the number of members, Beta received anywhere from $18,800 (80 members at $235) to $25,850 (110 members at $235) per month in dues.
Beta contends that the above evidence was insufficient to allow the jury to make a determination of punitive damages. Heretofore, we have held that lack of evidence as to a defendant's net worth (assets minus liabilities) to serve as a measure for punitive damages, precludes such an award. Whittington v. Whittington, 535 So.2d 573, 584 (Miss. 1988). Although Clyde Whittington put on proof showing that Wilmena Whittington had assets totalling $1,030,262.14, this Court reversed and rendered a $40,000.00 punitive damages award in favor of Clyde. This Court explained its holding as follows:
Showing assets is only a part of the equation in arriving at "net worth" or "financial worth" of an individual or legal entity. The defendant's proof failed to adequately establish her net worth  assets minus liabilities  so as to serve as a measure for the Court to consider in arriving at a sum to award as punishment in this case... . Therefore, we reverse and render on this point.
Whittington, 535 So.2d at 584 (citations omitted).
In T.C.L., Inc. v. Lacoste, 431 So.2d 918 (Miss. 1983), this Court stated the following in reversing the lower court's punitive damages award:
The proof in the case sub judice failed to adequately establish the net worth of appellants to such an extent as to serve as a measure of the correctness of the punitive damages award. We also note that an award of punitive damages is granted in the nature of punishment for wrongdoing and as an example so that others may be deterred from the commission of similar offenses, thereby in theory protecting the public. Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1977). Here, the award had the effect of destroying appellants' financial status rather than merely punishing them.

Lacoste, 431 So.2d at 923 (emphasis added). See also First American National Bank of Iuka v. Mitchell, 359 So.2d 1376, 1381 (Miss. 1978).
May concedes that this Court has recently required proof of net worth. She contends, however, that although the Court has considered net worth relevant in the past, it was not always the determining factor. In Collins v. Black, 380 So.2d 241 (Miss. 1980), this Court stated:
[T]he pecuniary ability to respond to a verdict for punitive damages may be considered by a jury, but it is not the sole factor to be considered by them.
*897 Id. at 244. See also Mutual Life Insurance Co. of New York v. Estate of Wesson by Hall, 517 So.2d 521, 532 (Miss. 1987), cert denied, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988); Allen v. Ritter, 235 So.2d 253 (Miss. 1970).
Furthermore, May points out that the award of punitive damages is a matter solely within the discretion of the jury and the jury's decision should not be disturbed unless it evinces such passion, bias and prejudice as to shock the judicial conscience. Life Insurance Co. of Mississippi v. Allen, 518 So.2d 1189, 1194 (Miss. 1987). See also Collins, 380 So.2d at 244; Snowden v. Osborne, 269 So.2d 858, 861 (Miss. 1972).
The evidence at trial indicated that Beta basically spent most of the funds it collected. As a result, Beta had, in a formal accounting sense, a negligible net worth even though it had the potential to collect $18,800 per month from its members. Beta also assessed additional fees to pay for parties. Beta went to some length not to own the real property which it occupied. Beta held no assets though it appears that it could have maintained ownership of assets had it desired to do so. In Whittington, the absolute and technical holding that one must precisely prove "net worth," assets minus liabilities, reveals many impracticalities. It is probable that Clyde Whittington (who sought the $40,000 punitive damages) could prove the assets of Wilmena, largely derived from mineral transactions in which he also had an interest, but could not prove Wilmena's liabilities.
In the case sub judice, Beta's financial ability allowed it to conduct substantial business in the business and university community, approximately $300,000 per year. It had the exclusive use of an expensive fraternity house and a sizable monthly cash flow. The selection by the defendant of management style, accounting procedures, and financial records or information may not defeat a proper award of punitive damages. In this case, May did the best she could with the facts and proof available, and she should not be denied punitive damages because of the business procedures of Beta. Only to the extent that Whittington requires proof of net worth to support an award of punitive damages, it is overruled so that all proof of assets, liabilities, income, accounting procedures that tend to diminish or expand any of those figures, and access to or denial of funds and properties may be considered if properly admitted into evidence.[2] To the extent that Whittington requires a precise determination of net worth, May could not offer such proof in accordance with a conventional accounting method; however, the jury had enough financial information to determine that Beta was capable of paying a punitive damage award.

IV.
The remaining issues raised by Beta on appeal are devoid of merit and do not warrant discussion. Therefore, the lower court's decision is affirmed on these issues.

V.
The lower court did not err in granting Jury Instruction P-10B. There was sufficient evidence that Beta was grossly negligent and failed to exercise due care. Furthermore, May presented sufficient proof to show that Beta was capable of paying the punitive damage award. Finally, this Court holds that Beta is a suable entity pursuant to Miss. Code Ann. §§ 37-111-1 to -11 (1972).
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, McRAE and ROBERTS, JJ., concur.
BANKS, J., concurs in part and dissents in part with separate written opinion.
*898 BANKS, Justice, concurring in part, dissenting in part:
I concur in all that is said by the majority, except its conclusion that punitive damages were warranted based on the conduct proved. Because I believe that the causative negligent conduct shown does not rise above the level of simple negligence, I dissent to that portion of opinion which affirms punitive damages.
NOTES
[1] Corp. leased the fraternity house from the University of Mississippi, then sub-leased the house to the members of Beta. The jury returned a verdict in favor of Corp., and none of the issues raised on appeal involve Corp.
[2] Note that in C & C Trucking Company v. Smith, No. 90-CA-0366, ___ So.2d ___ (dec. Dec. 17, 1992) (not yet reported), we held that it is not legally necessary for either party to introduce evidence of the net worth of defendant during the trial to support an award of punitive damages. C & C Trucking Company v. Smith, at ___. C & C Trucking also overruled Whittington to the extent that proof of net worth is a prerequisite to an award of punitive damages. C & C Trucking Company v. Smith, at ___-___.