632 So.2d 420 (1993)
W.B. DUGGINS, Jr.
v.
GUARDIANSHIP OF Maurice Kendall WASHINGTON, a Minor Through Mary B. HUNTLEY, His Mother and Guardian.
No. 91-CA-0082.
Supreme Court of Mississippi.
December 16, 1993.
Rehearing Denied March 10, 1994.
Dissenting Opinion on Denial of Rehearing March 10, 1994.
*422 R. Andrew Taggart, Kenneth W. Barton, and E. Marcus Wiggs, III, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, for appellant.
Paul Kelly Loyacono, Vicksburg, for appellee.
Before DAN M. LEE, P.J., and PITTMAN and JAMES L. ROBERTS, Jr., JJ.
Dissenting Opinion by Presiding Justice Dan M. Lee on Denial of Rehearing March 10, 1994.
PITTMAN, Justice, for the Court:
This is an appeal from the Warren County Chancery Court, Special Chancellor H. Gerald Hosemann presiding, wherein the Guardianship of Maurice Kendall Washington sought an accounting from the two attorneys who had represented the Guardianship in a medical malpractice action. A default judgment was entered against one of the attorneys, Douglas Barfield, after he failed to answer or otherwise make an appearance in the suit. The trial court found that Barfield had individually acted in such a way as to justify the imposition of punitive damages against him, but that the other attorney and appellant, W.B. Duggins, had not. The October 31, 1990, judgment of the trial court was later amended on December 17, 1990.

I.
Maurice Kendall Washington, a minor at the tender age of five, suffered an injury to his left eye while playing with a friend. It was never determined what exactly struck his eye, but it was suspected that a rock was the culprit. Maurice immediately told his parents, Mary B. Huntley and Willie Washington, of his injury whereupon his parents drove him to the Kuhn Memorial Hospital emergency room for treatment. The staff physician on duty examined Maurice and told his parents that Maurice needed to be seen by Dr. John Ederington, an ophthalmologist in Vicksburg. Throughout Dr. Ederington's two week treatment of Maurice's injury, his vision in his left eye continued to deteriorate, resulting in permanent corneal staining. After becoming dissatisfied with Dr. Ederington's inability to cure Maurice, his parents took him to Dr. Donald Hall for treatment. After examining Maurice, Dr. Hall immediately referred his parents to physicians at University Medical Center in Jackson. Following several surgeries to reduce the interocular pressure, it was determined that Maurice had less than fifteen percent use of his eye's optimal range.
On August 11, 1987, Maurice's parents went to the law offices of W.B. Duggins to enlist his services in pursuing a medical malpractice claim against Dr. Ederington. Duggins had represented Mary Huntley's uncle in the past and it was he who recommended Duggins to Mary and Willie. Following an initial consultation, Duggins agreed to represent the family and a contract for legal services was then signed. This employment contract provided that Duggins would receive the following percentages as compensation: 33 1/3% of recovery if the case was settled before suit was filed; 40% of recovery if the case was settled after suit was filed but before trial; and 50% of recovery if the case proceeded to trial and judgment was rendered. The contract also gave Duggins the right to employ additional counsel, in his sole discretion, at no additional expense to the clients.
Initially, a guardianship was established in which Maurice's mother, Mary Huntley, was adjudicated Maurice's legal guardian. Duggins realized that he needed to associate someone who had experience in pursuing medical malpractice claims. After informing Maurice's parents of the need to associate another attorney, Duggins contacted Douglas *423 Barfield, an attorney in Jackson with experience in the field of medical malpractice. Barfield had been highly recommended to Duggins by Clarence Whitaker, a tenant in the same building at Duggins' office. Barfield agreed to be associated with the case and met with Duggins and Maurice's parents two days later in Duggins' office. After meeting Barfield, Maurice's parents seemed satisfied with both his association and his qualifications. The two attorneys agreed that Duggins would compile Maurice's medical records and medication bills as well as maintain client contact. Barfield, on the other hand, was to draft and file the complaint, line up expert witnesses, and pursue negotiations with the defendant doctor's insurance company, St. Paul Insurance Company. Duggins and Barfield agreed to divide any attorneys' fees equally.
Unfortunately, the complaint on behalf of the Guardianship was never filed. Barfield sent Duggins a copy of a drafted complaint which gave the appearance of a filed complaint. This "complaint" was complete with a cause number (later determined to belong to another case filed by Barfield two years earlier) and the Hinds County Circuit Clerk's stamp and the purported date of filing. However, the clerk's stamp was not initialed, as was customary. Except for the absence of these initials, there was nothing to indicate to Duggins that anything was out of the ordinary. In December of 1988, Duggins was in Jackson conducting business at the Hinds County Courthouse when he decided to check on the Washington case. Duggins did not have the cause number with him at the time, so the clerk could only perform a cursory inspection which did not find the case. Duggins believed that he must have given the information to the clerk incorrectly, so he left the courthouse thinking it was a simple mistake. Any concerns Duggins had were dispelled because he remembered Barfield telling him that the case was set for trial the upcoming March.
Following his association in the case, Barfield engaged in negotiations with the defendant insurance company on behalf of the Guardianship. However, throughout these negotiations, Barfield never disclosed his being joint counsel with Duggins. In fact, St. Paul's representative testified that he had no knowledge of Duggins' involvement in the case. When Duggins inquired as to the status of the negotiations, Barfield told him that the negotiations were going well and that he anticipated a settlement of between $161,000 and $165,000. Since Duggins was of the belief that the suit had been filed, he expected to split 40% of the alleged $161,000 settlement with Barfield in attorneys' fees. At Barfield's suggestion, the two attorneys agreed to cap their attorneys' fees at $48,000 from the guardianship and $6,000 worth of fees from the insurance company's $15,000 settlement with Maurice's parents. Willie Washington testified that he was not aware of any such agreement. However, it was Duggins' belief that the attorneys' fees on the alleged $161,000 settlement would be $54,000 ($48,000 cap + $6,000), with Duggins' share amounting to $27,000.
At a May 3 settlement conference in Mayersville, Mississippi, Duggins drove Mary and Willie to the courthouse for a scheduled meeting with the judge, Barfield and St. Paul Insurance Company's attorney, Bill Lancaster. It was at this meeting that Duggins allegedly noticed that the amount of the settlement was $95,500 rather than the $161,000 that Barfield had represented. When Duggins whispered his concerns to Barfield, Barfield allegedly told him that the agreement should state $161,000. However, Duggins stated that pressure from the judge, Mary and Willie to settle the case prevented him from speaking up. After the parties executed the document, Duggins told Maurice's parents that it was his belief that the settlement should have been for $161,000 rather than $95,500. Duggins contacted the late Chancellor Bullard in Vicksburg the next morning to see about amending the settlement decree to $161,000. Duggins was told that there would be no problem and he was instructed to prepare an amended order for his signature. When Duggins conveyed this to Barfield, Barfield stated that he would draft the necessary documents for this amended order.
Following the settlement meeting on May 3, 1987, Duggins stated that he had some *424 business in the Delta to tend to and that he would not be returning to Vicksburg immediately. Since Barfield had an appointment in Port Gibson, he agreed to give Mary and Willie a ride back to Vicksburg. Unbeknownst to Duggins, when the settlement papers were signed at the courthouse, the attorney for the insurance company handed Barfield two settlement checks. The first check was made payable to the guardianship and Barfield in the amount of $54,289. The second check was for $15,000, made payable to Mary Huntley, Willie Washington and Barfield. Duggins' name did not appear on either check because neither the insurance company nor its attorney had knowledge of Duggins' involvement. Since Duggins neither heard anything about Lancaster's having the settlement checks with him nor saw any evidence that the checks would be disbursed on that day, Duggins allegedly told Barfield after the meeting not to cash any checks until they got the settlement amount straightened out. Duggins believed that the insurance company would mail the checks at a later date.
After leaving Mayersville, Barfield, Mary and Willie stopped at the First National Bank of Vicksburg to establish a guardianship account for Maurice. Barfield instructed Liz Burnette, a bank employee, that a trust account needed to be set up for Maurice and that the only way funds could be disbursed from that account would be by court order. Barfield told Burnette that he did not have the guardianship papers with him at that time, but he would bring them to the bank within the next few days. Barfield deposited the two checks totalling $69,289 into the newly opened account and immediately wrote a check to Mary Huntley and Willie Washington in the amount of $14,500, which was the parents' settlement from the insurance company. The remaining $500 was given to Barfield to repay him for money that he had loaned the parents to pay for the gasoline used in transporting Maurice to University Medical Center. The parents used this $14,500 to purchase a new car for transporting Maurice to and from his treatments in Jackson as well as to make some minor repairs on their home. This $15,000 amount was not included in the $95,500 settlement amount with the guardianship.
Barfield did not stop there with his check writing. That same day, he wrote a $12,500 check made payable to his wife, Deborah Barfield, and another check in the amount of $15,500 made payable to Kenneth E. Byrd. Barfield also wrote as many as seven more checks for cash over the next few weeks. After Barfield told Duggins that he would draft the amended order to reflect the $161,000 settlement, he stopped by Duggins' office on May 11 and delivered a $27,000 attorneys' fees check drawn on the trust account. It was then that Duggins realized that Barfield had set up his own trust account for the minor without Duggins' name appearing anywhere on the account. Duggins believed that this fee payment was based on 40% of $161,000, rather than the $95,500 figure listed on the settlement document executed on May 3. When Duggins asked about the additional amount of attorneys' fees, Barfield allegedly told him that he expected to settle a "big case" real soon so he was not going to take any attorneys' fees in this case. Rather, he wanted the guardianship to have his share of the fees. Relying upon Barfield's assurances that he would draft the amended decree, Duggins deposited the $27,000 check.
On May 10, Barfield, Mary, and Willie met at the bank in order to file the proper guardianship papers. Duggins was scheduled to meet them there earlier, but by the time he arrived, all the paperwork was completed. When he did arrive, he asked Mary and Willie if they were satisfied with everything, and they both replied that they were. While there, Barfield purchased a $1,200 Certificate of Deposit for the guardianship, using guardianship funds. When everyone was leaving the bank, Barfield handed Willie a receipt which showed the total attorneys' fees at $53,589. Willie thought the figure to be odd, but said nothing. Willie contacted Duggins the first week of August to ask him for a copy of the employment contract for legal services. Willie returned two days later when he told Duggins that he and Barfield owed the guardianship money. Duggins had no idea what Willie was talking about, but assured him that he would contact Barfield *425 to find out what was happening. After copying Willie's file for him, Duggins tried to reach Barfield, only to speak with his wife. Duggins explained to her that there might be some money unaccounted for and that he needed to speak with her husband as soon as possible. Barfield never returned his call, but Duggins received a short memo from Barfield in the mail the next day. Barfield's memo stated that he was moving to Tennessee and that he would be back through Vicksburg later that month to deposit excess money after all of the medical and hospital bills were satisfied.
It was at that point that Duggins really became concerned. Duggins immediately called Mr. Brister at the Hinds County Circuit Clerk's office to ask him to look up the case number listed on the purported "complaint." Mr. Brister did not assist Duggins at that point, but asked Duggins to put his request in the form of a letter. Shortly thereafter, Duggins received a letter from Brister stating that the number that Duggins had inquired about belonged to a case Barfield had filed two years earlier. He also confirmed that no case had ever been filed on behalf of Maurice Washington in Hinds County.
Duggins accepted the $27,000 check upon the belief that suit had been filed and that the settlement was to be amended to reflect a settlement of $161,000. Once it was determined that the net present cash value of the settlement was $95,500 and not $161,000, and that the suit had not ever been filed, the proper amount of attorneys' fees had to be recalculated. In the initial settlement decree, the chancellor approved attorneys' fees of $38,200 of which each attorney would receive $19,100. However, this determination was premised on the belief that suit had been filed and the 40% was therefore applicable. The terms of the structured settlement included a $69,289 initial payment, $150 a month payment to Maurice until he reached age eighteen, an $8,000 payment due in two years, a $15,000 payment to Maurice at age nineteen, a $25,000 payment at age twenty-six, and a $100,000 payment at age thirty-one.
After all of Barfield's deceit was finished, the only thing remaining from the initial $69,298 May 3, 1988, deposit was the $1,200 Certificate of Deposit. Duggins contacted the State Bar Association about filing a claim in an effort to restore guardianship money that had been misappropriated by bar members. Barfield has subsequently been disbarred and has plead guilty to a felony and was sentenced to the penitentiary. Although this three year sentence was suspended, Barfield was ordered to a restitution center in an effort to repay for his inexcusable actions.
At trial, the chancellor granted a directed verdict in favor of First National Bank, thereby releasing it from any liability associated with disbursing guardianship monies in the absence of a court order. St. Paul Insurance Company was also dismissed from the suit. Since Barfield did not appear at trial, the chancellor entered a default judgment against him as well as an award for punitive damages. The chancellor also found that Duggins' acts, alone, would not constitute grounds for punitive damages, however the chancellor found Duggins vicariously liable, therefore subject to punitive damages. Feeling aggrieved by the chancellor's ruling, Duggins appeals on the following grounds:
1. THE TRIAL COURT ERRED IN HOLDING DUGGINS VICARIOUSLY LIABLE FOR ANY DAMAGES ASSESSED AGAINST BARFIELD.
2. THE TRIAL COURT ERRED IN FINDING THAT ATTORNEY'S FEES MAY BE ASSESSED AGAINST DUGGINS.
3. THE TRIAL COURT SHOULD HAVE CALCULATED AMOUNTS DUE THE GUARDIANSHIP FROM FUNDS RECEIVED BY BARFIELD ONLY.

Lower court findings.
The special chancellor found that it was in the best interests of the guardianship to settle the case for the $95,500 net present cash value offered. However, a previous award of attorneys' fees amounting to 40% of the settlement was rescinded when it was shown that suit had never been filed. Barfield and Duggins were found liable to the guardianship in tort and for breach of employment *426 contract. The chancellor specifically found Duggins vicariously liable for Barfield's actions under both statutory law and present case law since Barfield's actions were within the scope of the partnership. After hearing limited testimony concerning Duggins' net worth and no testimony of Barfield's net worth, the chancellor awarded the guardianship $500.00 in punitive damages. Attorneys' fees were also awarded as a matter of equity and law. However, these fees will only be considered after the guardianship has been made whole. The chancellor found that the guardianship should be reimbursed $53,089.00, plus prejudgment interest, in order to fully restore the guardianship.

II.

Should Duggins be held vicariously liable for the actions of Barfield?
In this age of specialization of attorneys, it is not uncommon for the association of counsel in areas in which an attorney might not possess the required knowledge to pursue his client's claim. With this association goes the sharing of control and responsibilities, the work involved, and the rewards. However, too often overlooked are the liabilities and the possible exposure that go along with association. Such is the case with this present appeal. Necessary to an association of counsel is the client's knowledge and consent to this association. An agreement, preferably in writing, with the client concerning the division of legal representation may prevent the liability of one attorney for any errors committed by the other. See Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice, § 5.6 at p. 279 (3rd ed. 1989); see also Foster v. McLain, 198 So.2d 463 (La. 1967). However, if the division of responsibility is not clearly spelled out, the client's consent to the association does not prevent vicarious liability between or among counsel when the attorneys share the representation and legal fees. See Mallen & Smith, supra at pp. 279-80. Even an attorney who retains a supervisory role in the pursuance of a claim may be directly liable for negligent supervision. Id.; see also Tormo v. Yormark, 398 F. Supp. 1159 (D.N.J. 1975).
The question at the heart of this case is whether an attorney who associates another attorney remains vicariously liable for the associated attorney's actions. The appellant Duggins asserts that the answer is no, claiming that his relationship with Barfield was that of an independent contractor, and as such, he is not liable for the actions of Barfield. The Guardianship, on the other hand, argues that Duggins remains vicariously liable for Barfield's actions according to partnership and joint venture law.
An independent contractor is one who contracts to do work according to his own methods without being subject to the control of his employer except as to the results of the work. Miss. Code Ann. § 71-3-3(r) (1972). Consequently, the beneficiary of work performed by an independent contractor is not liable for acts or omissions of the contractor. Webster v. Mississippi Publishers Corp., 571 So.2d 946, 951 (Miss. 1990); Fruchter v. Lynch Oil Co., 522 So.2d 195, 199 (Miss. 1988). However, the key issue which needs to be analyzed between the parties is control.
Duggins initiated Barfield's association in the case, not the guardians. The employment contract, executed by Mary and Willie, was with Duggins, not Barfield. The contract gave Duggins the power to associate whomever he wanted without having to get client consent. Therefore Barfield's participation in the case is solely attributed to Duggins. When Duggins associated Barfield, it was not as an independent contractor, but an equal. Duggins was to handle the client contact and do all the necessary leg work such as compiling medical records. Barfield was to use his experience in the area of medical malpractice to draft and file the complaint and to negotiate with the insurance company in the hopes of settling the claim. Although a written agreement was never executed between Duggins and Barfield, it was mutually agreed upon that the fees be split 50/50 between them. It was therefore inherent in the agreement that each attorney would have an equal stake in the outcome of the case and there would be joint control of the case. Were Barfield an independent contractor, his likely fee would *427 not have been a percentage of the outcome but a set figure determined at the outset.
The nature of the partnership's business establishes the apparent scope of the partner's authority. Apparent authority is limited to the normal business of the law firm. See Mallen & Smith, supra, § 5.3, p. 267. Duggins' and Barfield's relationship can be described as a joint venture, at the least. In Hults v. Tillman, 480 So.2d 1134 (Miss. 1985), this Court compared a joint venture to a partnership, stating:
There is no difference between a partnership and a joint venture except the latter has limited and circumscribed boundaries. Indeed, the only purpose in distinguishing a joint venture from a partnership is to define a business relationship which is limited to specified undertakings for profit, rather than a general and continuing business of a particular kind. [Citations omitted] The legal principles for determining the existence of each are identical. [Citations omitted].
480 So.2d at 1141-42. In simplest form, a joint venturers can be defined as a single purpose partnership, whereby the joint ventures undertake a single project for profit. Whittington v. Whittington, 535 So.2d 573, 586 (Miss. 1988).
Because of these similarities, this Court has stated on several occasions that the Uniform Partnership Act (UPA), which this state adopted in 1976, is applicable to joint ventures. Whittington, 535 So.2d at 585-86; Hults, 480 So.2d at 1144-45. This being the case, we should look to the applicable portions of the UPA for guidance.
The statutory definition of a partnership is an association of two or more persons to carry on as co-owners a business for profit. Miss. Code Ann. § 79-12-11 (1972). Deeply embedded in partnership law is that of agency law. Section 79-12-17(1) illustrates this, stating:
Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.
Miss. Code Ann. § 79-12-17(1) (1972). According to this code section, a partner is an agent of the partnership and therefore binds the partnership if acting within the usual scope of the partnership.
The UPA addresses liability among partners in § 79-12-25 stating:
Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners, loss, or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.
Miss. Code Ann. § 79-12-25 (1972). Therefore, a loss or injury caused by an individual partner acting within the scope of the partnership is imputed to the partnership.
Next, § 79-12-27 states:
The partnership is bound to make good the loss:
(a) Where one partner acting within the scope of his apparent authority receives money or property of a third person and misapplies it; and
(b) Where the partnership in the course of its business receives money or property of a third person and the money or property so received is misapplied by any partner while it is in the custody of the partnership.
Miss. Code Ann. § 79-12-27 (1972). This code section requires that one partner make good for another partner's misappropriation of money or property while in the custody of the partnership. Finally, the UPA provides that all partners are jointly and severally liable for all debts and obligations of the partnership. Miss. Code Ann. § 79-12-29 (1972).
In applying the UPA to this case, Barfield's acts can be clearly imputed to *428 Duggins. Barfield's misappropriation of the guardianship's funds was well within the scope of the partnership's business. Barfield's involvement was procured solely by Duggins, and they agreed that any attorneys' fees would be split equally. Both attorneys had an equal stake in the case and depended upon each other's abilities in proceeding with the case. Even if this Court did not choose to apply the UPA to this situation, Duggins could be found accountable for Barfield's actions by applying the principles of vicarious liability.
In support of Duggins' argument against vicarious liability being applicable to this case, he relies on the case of Idom v. Weeks & Russell, 135 Miss. 65, 99 So. 761 (1924). In Idom, one partner shot an alleged burglar outside of the partnership's store. This Court held the innocent partner not liable for his partner's actions which were committed outside the scope of the partnership. While Idom remains good law, it is distinguished from the present case. In this case, Barfield's actions were committed while in furtherance of the partnership and was certainly within the partnership business. The handling of client funds is clearly within the realm of an attorney's representation of a guardianship in a legal action.
The cases on which the guardianship relies are more applicable to the circumstances sub judice. Although the cases are old, they remain good law. In Heirn v. McCaughan, 32 Miss. 17 (1856), this Court held that compensatory and exemplary (punitive) damages assessed because of a wrongful act of a copartner committed in pursuit of the partnership business could be recovered from a partner who had not actually participated in the act. Id. at 43. Heirn involved one partner's issuance of a letter stating that his ship would pick up certain passengers in Pascagoula on a certain day. However, the boat failed to make the scheduled stop. When the injured passengers filed suit, this court allowed compensatory and punitive damages against another partner who had not issued the letter. The reasoning behind this Court's decision was that the wrongful act was connected with the business of the firm, that the tort of one partner is considered the joint and several tort of all partners, and that the partner doing the act was considered the agent of the other partners. Id. at 50.
Also, in Robinson v. Goings, 63 Miss. 500 (1886), this Court held that the conversion of three bales of cotton by one member of a firm in the furtherance of the business made the other members of the firm equally liable even though they took no part in the illegal act. Id. at 504. Moreover, punitive damages were allowed against the other partners.
A search of other jurisdictions reveals several cases involving similar facts to the case sub judice. In Fitzgibbon v. Carey, 70 Or. App. 127, 688 P.2d 1367 (1984), review denied 298 Or. 553, 695 P.2d 49 (1985), the Oregon district court found that a law partnership who associated a professional legal corporation to pursue a class action constituted a joint venture. The court reasoned that a joint venture is in essence a contract, whether implied or expressed, and the intention of the parties is therefore controlling. Id. at 1370. The parties in Fitzgibbon agreed to carry on the business of representing the client as a business, for profit. Id. This intent may be demonstrated by showing joint rights of control, joint liability for losses and a right to share the profits. Id. The evidence showed an intent to share the decision-making process as well as the costs involved. Absent a specific agreement to divide the profits in a manner other than equally, it was determined that the fee would be divided equally.
Although the issue in this case revolved around fee allocation, the principles of joint ventures are applicable to the case at bar. The same basis of intent to share both the responsibility and the profits from this representation clearly demonstrate the presence of a joint venture. Duggins was to do much of the preliminary work such as compiling medical records and maintaining client contact and Barfield was to draft and file the complaint and handle the negotiation process with the insurance company. Although the two attorneys were to handle different aspects of the case, they were both working for the same common goal, the maximization of the client's claim. Both attorneys were cognizant *429 that their fee would be directly tied to the amount of the settlement of the claim.
Likewise, in Floro v. Lawton, 187 Cal. App.2d 657, 10 Cal. Rptr. 98 (1960), the California District Court of Appeals held that in a legal malpractice action, a plaintiff could recover against both the initial attorney hired to represent the party as well as another attorney associated by the initial attorney. Due to a scheduling conflict, the initial attorney was not able to perform the necessary trial work for the case so he associated another attorney to represent the client at trial. Following the client's consent to this association, the attorneys agreed to divide the fee from the case on an equal basis. The plaintiff was successful in recovering a judgment for a slander claim, but was unsuccessful in his pursuit of his malicious prosecution and false arrest claims. Although the district court judge held that both attorneys were not proven to be negligent in their handling of the case, he did find that both attorneys could have been liable for the actions or omissions of the associated attorney with respect to the unsuccessful claims. Id. 187 Cal. App.2d at 671, 10 Cal. Rptr. at 106.
An attorney who decides to associate other counsel can incur liability concerning the matter in which counsel is selected or recommended. See Mallen & Smith, supra at p. 281. In Tormo v. Yormark, 398 F. Supp. 1159 (D.N.J. 1975), a case not totally analogous to the case at hand but factually similar, the New Jersey court went further than we are called on to do today in that the issue before the court involved a New Jersey attorney calling to solicit business from a New York attorney. The New York attorney referred the case to the New Jersey attorney without investigating the New Jersey attorney's qualifications other than his being licensed to practice law in the State of New Jersey. Had the New York attorney made further inquiry, he would have found out that the New Jersey attorney had just been indicted for fraud. Following the referral of the case, the New Jersey attorney was convicted of the crime and subsequently disbarred. During the interim, the New Jersey attorney settled the case and embezzled a substantial portion of the proceeds.
The New Jersey federal district court held that an attorney must exercise ordinary skill and care when referring a client to another attorney. The court did note that the New York lawyer was correct in relying on the State of New Jersey's granting a license to practice law since the license created a presumption that the attorney was fit to practice law. However, the district court did find liability based upon the New York attorney's failure to investigate the attorney who participated in the unethical conduct of client solicitation. That "red flag" should have alerted the New York attorney to check out the New Jersey attorney further.
As the chancellor stated in his opinion, there were sufficient "red flags" which should have caused Duggins to realize that something was amiss. Duggins' negligence and inaction in investigating Barfield's suspicious conduct allowed the guardianship to be stripped of all its assets. Contrary to Duggins' claims of being victimized by Barfield, he is not the true victim. The true victim is the guardianship that Duggins was sworn to protect. There is no question that the guardianship relied on Duggins to pursue its best interests. Rather than spending his time trying to save his own dollars, Duggins should have given more energy to the efforts which would have restored all guardianship assets. His first duty as a member of the bar and as an employed attorney is to his client, the guardianship.

III.

Is Duggins vicariously liable for punitive damages?
If the partner acted within the course and scope of actual or apparent authority, then even liability for fraudulent wrongs can be imputed to the partnership. See Mallen & Smith, supra at p. 268; see also Cook v. Brundidge, Fountain, Elliott & Churchill, 533 S.W.2d 751 (Tex. 1976); Smyrna Developers, Inc. v. Bornstein, 177 So.2d 16 (Fla.App. 1965). The other partners, though innocent without knowledge of the act or omission, can be vicariously liable. See Mallen & Smith, supra at p. 268.
*430 Duggins argues that punitive damages should not be assessed against him since he was an innocent partner to the misappropriation of the guardianship's funds. He again cites Idom as supporting authority. However, it seems apparent that if Duggins can be found to be vicariously liable for the actions of Barfield, he can also be found liable for punitive damages. The venerable cases of Heirn and Robinson both found punitive damages appropriate against an innocent partner for actions done by another partner while engaged in work within the scope of the partnership. Although these cases are quite old, they have both withstood the test of time, with their legal reasonings and conclusions intact. The same statutory arguments used in finding Duggins vicariously liable for Barfield's actions can be applied for the imposition of punitive damages. Specifically, § 79-12-27 of the UPA imposes a liability on a partner to make good a loss of another partner's actions when acting with the scope of the partnership.
The chancellor in this case awarded punitive damages in the amount of $500 against both Duggins and Barfield. The chancellor based this determination on the statutory law which makes partners liable for each other's acts. The guardianship presented evidence concerning Duggins' office building, home, automobiles, and law practice. The testimony regarding Duggins' financial condition was of a general nature, not specifically elaborating on the actual value of each asset or liability. The court also received evidence concerning Duggins' insurance policies, although the policy itself was later withdrawn from evidence.
As it has been determined that punitive damages can be assessed against partners when one partner's actions fall within the scope of the partnership, we must next ascertain whether guardianship proved the requisite net worth to support the imposition of punitive damages. In doing so, we must first determine if sufficient evidence of Duggins financial condition was presented to warrant the award of punitive damages. In Whittington v. Whittington, 535 So.2d 573 (Miss. 1988), this Court held that a lack of evidence as to the defendant's net worth (assets minus liabilities) to serve as a measure for punitive damages precludes such an award. However, in Beta Chapter of Beta Theta Pi Fraternity v. May, 611 So.2d 889 (Miss. 1992), this Court in essence overruled the strict and technical requirement of proving net worth as found in Whittington, stating:
Only to the extent that Whittington requires proof of net worth to support an award of punitive damages, it is overruled so that all proof of assets, liabilities, income, accounting procedures that tend to diminish or expand any of those figures, and access to or denial of funds and properties may be considered if properly admitted into evidence. To the extent that Whittington requires a precise determination of net worth, May could not offer such proof in accordance with a conventional accounting method; however, the jury had enough information to determine that Beta was capable of paying a punitive damage award.
611 So.2d at 897. Because of the Beta fraternity's conduit-like cash flow basis, the fraternity's net worth could not be proven in a technical sense using conventional accounting methods. Although Duggins' net worth could technically be proven, the proof offered was of a general nature. When specifically asked about his home, cars, and office building, Duggins responded that he was still paying notes on them. No evidence of the amount of equity or the amount of debt associated with the assets was specifically presented, nor was any sort of financial statement. However, when Beta is applied to the present case, and the amount of punitive damages awarded is considered, it is evident that the guardianship presented enough proof of Duggins' net worth to support the imposition of the $500 punitive damage award. The amount awarded is sufficient to notice the defendant and the Bar in regard to the subject matter.

IV.

Is the Guardianship entitled to attorneys' fees?
Duggins claims that the guardianship is not entitled to receive attorneys' fees for this appeal. We have long followed the rule that *431 a prevailing party is not entitled to recovery of attorneys' fees in the absence of statute, contract or the assessment of punitive damages against the defendant. Stanton & Associates v. Bryant Construction Company, 464 So.2d 499, 502 (Miss. 1985); Bellefonte Insurance Company v. Griffin, 358 So.2d 387, 391 (Miss. 1978); Faulkner Concrete Pipe Company v. United States Fidelity & Guaranty Company, 218 So.2d 1, 3 (Miss. 1969). In Grisham v. Hinton, 490 So.2d 1201, 1205-08 (Miss. 1986), we reaffirmed this rule, stating that the issue was a legislative one rather than one for the judiciary to resolve.
However, this Court revisited the issue again in an analogous situation involving insurance bad faith case in Andrew Jackson Life Insurance Company v. Williams, 566 So.2d 1172 (Miss. 1990). In footnote 13 of Andrew Jackson, this Court stated:
Conceivably, upon presentation of sufficient proof, consequential or extra-contractual damages (e.g., reasonable attorney fees, court costs, and other economic losses) may be awarded in cases involving a lack of a reasonably arguable basis-notwithstanding that the insurer is not liable for punitive damages. [citations omitted].
566 So.2d at 1186. Since the language in the footnote clearly defines attorneys' fees as being of a consequential and not a compensatory nature, it appears that the Guardianship should be entitled to them under the right circumstances.
The chancellor held that consideration of attorneys' fees for the guardianship's subsequent suit against Duggins should be reserved until the guardianship is made whole. We agree with the chancellor's wise decision. At the time the guardianship is restored, the chancellor should then consider the appropriate amount of attorneys' fees which should be afforded the guardianship's present counsel. The restoration of the guardianship to its original position includes covering the costs associated with this present appeal. It seems rather ludicrous that a guardianship which must sue in order to be made whole should be saddled with attorneys' fees for that purpose and the costs associated with pursuing this subsequent action. To do so would only serve to again deplete the guardianship's assets. We also affirm the chancellor's decision denying Barfield any attorneys' fees as a result of his representation of the guardianship.
Following the restoration of the guardianship, the chancellor should consider an appropriate attorneys' fee with which to compensate Duggins for his services. Although Duggins may not be entitled to the entire 33% as agreed upon initially, we do note from the record that Duggins is entitled to some fee. The assets were not stolen from the guardianship until after the case had been settled and approved by the chancellor. Hence, the guardianship did benefit from Duggins' representation when it agreed to the $95,500 negotiated settlement. A possible method for determining the appropriate amount of attorneys' fees to which Duggins is entitled would be to compensate him on a quantum meruit basis. See Tyson v. Moore, 613 So.2d 817 (Miss. 1992). Further, the lower court on remand may want to review the monies paid to the parents of Maurice Kendall Washington to assure the court that monies were properly paid to the parents by the guardianship.
Duggins remains at risk as long as the guardianship remains depleted. We see Duggins' best interests being protected only after the guardianship is restored to its original position. Therefore, we agree with the trial judge to first make the guardianship whole, so that every dime due the guardianship is in the account of the guardianship. Duggins' entitlement, (if any), to attorneys' fees should be considered only after the guardianship's assets are fully restored. Again, Duggins is not the victim. His lack of action and attention allowed the guardianship to be victimized. Further, we sadly note that his efforts to date have been almost totally to protect himself financially with little attention to restoring or protecting the guardianship. Duggins' actions following the discovery of his partner Barfield's fraud are as misplaced as his original association of Barfield. Mr. Duggins needs to join with the efforts of the Warren County Chancery Court in restoring the guardianship funds. *432 Then and only then will the monetary claims of Duggins be considered.
We therefore affirm the special chancellor's determination of Duggins' liability to the guardianship as a result of his joint venture/partnership with Barfield. We also affirm the chancellor's award of $53,089.00 to the guardianship, plus pre-judgment interest at the rate of eight percent, commencing on May 3, 1989. The chancellor calculated the amount needed to restore the guardianship to be $53,089. On remand, the chancellor may continue his review of the calculation of the exact amounts. Although we cannot determine from the record the exact amount required to fully restore the guardianship to its lawful position, we do know the guardianship is entitled to 100% of the assets rightfully belonging to it. We therefore affirm the lower court's decision, but do so under the assumption that the $53,089 figure determined by the lower court will in fact restore the guardianship to its original position. The $500 punitive damages award against Barfield and Duggins is affirmed. The matter is remanded for calculation of attorneys' fees to be awarded to the guardianship's present attorney for his work in restoring the guardianship to its original position and for further determination of fees to Duggins for his representation of the guardianship.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, McRAE, JAMES L.
ROBERTS, Jr. and SMITH, JJ., concur.
BANKS, J., concurs in part with separate written opinion joined by DAN M. LEE, P.J.
BANKS, Justice, concurring in part:
I concur in the result reached by the majority and most of what is said in justification of that result. I write separately only to disassociate with what I believe to be a confusing discussion separating the question what it takes to make the estate "whole," from the question what is due Duggins. Majority opinion, pp. 26-28. In my view, what it takes to make the estate "whole" is the net proceeds of the settlement after a deduction for the amount due Duggins for attorney's fees.
It follows that the determination of the amount due Duggins must proceed simultaneously with the determination of the amount due to make the estate whole.
DAN M. LEE, P.J., joins this opinion.

ON PETITION FOR REHEARING
Petition for Rehearing denied March 10, 1994.
DAN M. LEE, Presiding Justice, dissenting:
Upon reflection, it is quite clear to me that the authority cited by the majority is not at all sufficient to justify so broad a departure from our settled law with respect to punitive damages. Accordingly, I would grant the Appellant's Petition for Rehearing and reverse and render with respect to the lower court's holding that W.B. Duggins, Jr., is jointly liable for the punitive damages assessed against Douglas Barfield. In my opinion, the reasoning and rationale that support exemplary damages have no application in this vicarious liability case.
In recent years, our punitive damages jurisprudence has evolved to the point that the basic contours are now well defined. A few of the guiding principles follow:
[A] plaintiff is entitled to punitive damages only if he has demonstrated a willful or malicious wrong or the gross, reckless disregard for the rights of others.
Strickland v. Rossini, 589 So.2d 1268 (Miss. 1991).
Punitive damages are assessed as an example and warning to others and should be allowed only with caution and within narrow limits.
State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242, 249 (Miss. 1985); Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239, 247 (Miss. 1977).
"Punitive damages are assessed only in extreme cases." South Central Bell v. Epps, 509 So.2d 886, 893 (Miss. 1987); Gardner v. Jones, 464 So.2d 1144, 1148 (Miss. 1985); *433 Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983).
Finally, and most importantly for the resolution of this case, "punitive damages are recoverable where the defendant has done to the plaintiff such a wrong as to import insult, fraud, oppression or reckless disregard for the rights of the plaintiff." Gardner v. Jones, 464 So.2d 1144, 1149 (Miss. 1985).
Although not controlling in this case, our legislature has recently mandated that punitive damages are only proper where "the defendant against whom punitive damages are sought" has acted with actual malice, gross negligence, etc. See Miss. Code Ann. § 11-1-65 (1993 Supp.). This statute absolutely forecloses vicarious liability for punitive damages in actions arising after the effective date.
At the heart of these cases is the simple notion that punitive damages should not be available against a defendant who is innocent of any morally culpable conduct. In the present case the lower court specifically found that Duggins' conduct did not rise to the level necessary to justify an award of punitive damages against him directly. No purpose would be served by punishing Duggins under these facts. Therefore, I would grant the petition for rehearing as to vicarious liability for punitive damages (and reverse and render) but deny on all other issues.
Furthermore, I am constrained to point out that the authority relied upon by the majority is neither controlling nor convincing. The majority's discussion of this matter begins with a quotation from a legal malpractice treatise. It is noteworthy that the passage is taken from a discussion of the vicarious liability of partners in the practice of law. Even assuming that the same reasoning would apply in cases where attorneys are merely associated for one particular case, the quotation, in context, directly contradicts the majority's position:
If the partner acted within the course and scope of actual or apparent authority, then even liability for fraudulent wrongs can be imputed to the partnership. The other partners, though innocent and without knowledge of the act or omission, can be vicariously liable. The vicarious liability of innocent partners or the partnership, however, does not extend to punitive damages.

Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractce, § 5.6 at 279 (3rd ed. 1989) (emphasis added).
The majority further relies on § 79-12-27 of the Mississippi Code in support of its position. However, that statute requires only that a partnership "make good the loss" caused by certain acts of one partner. By definition punitive damages have nothing to do with making good a loss. Thus, this statute is wholly inapplicable.
Finally, the majority relies on a pair of Pre-cambrian cases that hold business partners responsible for torts, apparently including punitive damages, committed in the course of the business. Although the majority characterizes them as "having withstood the test of time," these cases have not been followed by this Court in a single reported modern case. Insofar as those cases may be read to indicate that an attorney who associates with other counsel in good faith may be held vicariously liable for puntive damages, I would hold that they are inconsistent with and overruled by the legion of recent cases limiting the availability of such damages. See supra. Thus we are left only with the majority's assertion that "it seems apparent that if Duggins can be found to be vicariously liable for the actions of Barfield, he can also be found liable for punitive damages." Suffice it say that I do not find such a result to be apparent in light of our frequent statements on the narrow purpose of punitive damages.

CONCLUSION
For the foregoing reasons, I would grant the Petition for Rehearing and reverse and render as to Duggins' liability for punitive damages, but deny as to all other issues.
HAWKINS, C.J., joins this opinion.